The CESSNA AIRCRAFT COMPANY, Appellant,

v.

John H. DALTON, Secretary of Navy, Appellee.

No. 96–1185.

United States Court of Appeals, Federal Circuit.

Oct. 6, 1997.

---

Herbert L. Fenster, McKenna & Cuneo, L.L.P., Denver, CO, argued for appellant. With him on brief were Michael T. Janik and David Kasanow, Washington, DC.

Geoffrey C. Cook, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for appellee. With him on brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director.

Before LOURIE, CLEVENGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

The Cessna Aircraft Company ("Cessna") appeals from March 12, 1993 decision of

Armed Services Board of Contract Appeals ("Board") on cross-motions for partial summary judgment in *Cessna Aircraft Co.,* ASBCA No. 43196, 93–3 BCA ¶ 25,912, 1993 WL 89795 (Mar. 12, 1993) (*Cessna I* ). Cessna also appeals from Board's September 21, 1995 decision following a hearing in same case, 96–1 BCA ¶ 27,966, 1995 WL 575173 (Sept. 21, 1995) (*Cessna II* ). In those decisions, Board denied Cessna's claims that Naval Air Systems Command of United States Navy ("Navy" or "NAVAIR") failed to exercise, in a proper and timely manner, certain options under a contract between Cessna and Navy. We affirm.

### BACKGROUND

### I.

This appeal arises out of Contract No. N00019–83–C–0090, awarded to Cessna by Navy, under which Cessna was required to provide training, and related technical and maintenance support, for undergraduate naval flight officers at U.S. Naval Air Station in Pensacola, Florida. *See Cessna I,* 93–3 BCA at 128,876.[1]

The contract called for Cessna to provide flight training services during five program years, commencing August 1, 1984, and ending September 30, 1988. *Cessna I,* 93–3 BCA at 128,876. Each program year ended on last day of government's fiscal year, September 30. *Id.* In addition, contract contained an option provision allowing Navy to extend contract performance for three additional years. *Id.* Section H–6 of contract Schedule, entitled "Exercise of Option," established conditions on Navy's exercise of option. Section H–6 provided as follows:

Pursuant to "Option to Extend Services" clause, option for three years will be exercised, if at all, in writing by a unilateral modification to this contract issued by Contracting Officer, Naval Air Systems Command, not later than 1 October 1988.

*Id.* Each option year ran from October 1 to September 30; that is, first option year ran from October 1, 1988 to September 30, 1989, second option year ran from October 1, 1989 to September 30, 1990, and third option year ran from October 1, 1990 to September 30, 1991. *Cessna* I, 93–3 BCA at 128,876. The Navy had to notify contractor of availability of funds for second and third option years.

The timing of this notification was addressed by section H–8 of contract Schedule, entitled "Multiyear Procurement," which stated that:

If three year option is exercised, date within which contracting officer ... will notify Contractor of availability of funds sufficient for performance of requirements for the

Second Option Year (Fiscal Year 1990) is 1 October 1989. Third Option Year (Fiscal Year 1991) is 1 October 1990.

*Id.* at 128,877. The contract further incorporated by reference, *inter alia,* two Defense Acquisition Regulation ("DAR") provisions concerning multiyear aspects of contract. The first, named "Cancellation of Items" clause, addressed cancellation of contract based on a lack of availability of funds. This clause stated in pertinent part:

(b) As used herein, term "cancellation" means that Government is canceling, pursuant to this clause, its requirements for items as set forth in Schedule for all fiscal years (1 October—30 September) subsequent to that in which notice of cancellation is provided. Such cancellation shall occur only if Contracting Officer (i) notifies Contractor that funds will not be available for contract performance for next succeeding fiscal year and any subsequent fiscal year; or (ii) fails to notify Contractor prior to beginning of next succeeding fiscal year that funds have been made available for performance in succeeding fiscal year.

DAR § 7–1903.33(d).[2] A related clause addressed contract execution once funds became available. It stated in pertinent part that:

Upon availability to Contracting Officer of funds for performance of requirements in

---

**1.** We addressed other claims that Cessna made arising out of the same contract in *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298 (Fed.Cir.1996).

**2.** The DAR has since been replaced by the Federal Acquisition Regulation ("FAR"). The analogous FAR provision is 48 C.F.R. § 52.217–2 (1996).

next succeeding fiscal year, Contracting Officer shall notify Contractor in writing of amount of funds available for contract performance in next succeeding fiscal year and contract shall be modified accordingly. DAR § 7–1903.33(c).[3]

The contract was awarded on May 10, 1983. Sometime in either late March or early April of 1988, during final program year of original five-year term of contract, Cessna contacted contracting officer ("CO") to inquire about whether Navy intended to exercise three year option. *Cessna II,* 96–1 BCA at 139,686. In response, by letter dated April 18, 1988, CO informed Cessna that Navy did intend to exercise option, stating that:

1. You are hereby notified of our intent to exercise option for three option years under Contract N00019–83–C–0090. Pursuant to Special Provision H–6, "Exercise of Option," we will exercise option for three option years, if at all, not later than 1 October 1988.

*Id.*

On August 3, 1988, during negotiation meetings concerning unrelated claim for equitable adjustment made by Cessna, Cessna again raised issue of when Navy intended to exercise option. *Id.* At that time, Cessna expressed its view that option had to be exercised *before* October 1, 1988. *Id.* On September 26, 1988, in a telephone conversation between CO and a Cessna official, CO asked whether, because October 1, 1988 was a Saturday, it would be acceptable for option to be exercised on October 3, 1988. *Cessna II,* 96–1 BCA at 139,687. The Cessna official responded that October 3 would be a problem and that Cessna needed to receive exercised option on October 1. *Id.* CO informed Cessna official at that time that she would exercise option via facsimile on October 1. *Id.*

During period September 27–30, 1988, in midst of further negotiations regarding Cessna's equitable adjustment claim, Cessna reiterated its view that Navy had to exercise option by September 30, 1988, while the Navy contended that it had until October 1. *Id.* As of September 30, 1988, the Department of Defense Appropriation Act, 1989, Pub.L. No. 100–463, 102 Stat. 2270 (1988),

from which the contract at issue would be funded, had been passed by Congress but had not yet been signed by the President. *Cessna II,* 96–1 BCA at 139,687. On September 30, the CO informed Cessna that the option would be faxed on October 1. *Id.* at 139,688. Anticipating the passage of the appropriation act, on September 30, 1988, a NAVAIR budget analyst executed a "Financial Accounting Data Sheet"—used to make funds available for obligation—with the proviso "EXECUTION OF THIS DOCUMENT IS CONTINGENT ON CONGRESSIONAL PASSAGE OF THE FY89 APPROPRIATION ACT OR OTHER AUTHORITY." *Id.* at 139,687–88.

On October 1, 1988, after receiving word from a NAVAIR division director that the President had signed the appropriation act, the CO executed the necessary contract modification, deleted the proviso from the Financial Accounting Data Sheet, and faxed the modification and data sheet to Cessna. *Id.* at 139,688. Cessna personnel found the faxed version of the modification and data sheet on Monday, October 3, 1988. *Cessna II,* 96–1 BCA at 139,689.

By letter dated October 7, 1988, Cessna took the position that the purported modification was ineffective. *Id.* The letter further stated that Cessna would continue to provide services and would submit a proposal for continuation of the work. *Id.* at 139,689–90. On December 5, 1988, Cessna submitted a proposal to the Navy for providing services for the three option years. *Id.* at 139,690. In its letter, Cessna stated that it was proceeding under the assumption that its services would soon be embodied in a definitive contract. By letter dated December 7, 1988, the CO responded that the option was exercised properly on October 1, 1988, and instructed Cessna to continue performance in accordance with the contract as modified by the option. *Cessna II,* 96–1 BCA at 139,690. Cessna provided services throughout the three year option period. Similar to the first option year, for the second and third option years, pursuant to section H–8 of the contract, the Navy transmitted the appropriate

---

**3.** No FAR provision analogous to section 7– 1903.33(c) currently exists.

modifications on October 1, 1989, and October 1, 1990, respectively.

## II.

In April of 1991, Cessna submitted a certified claim to the CO, as revised in June of 1991, seeking approximately $25.7 million as additional compensation for work performed during the three year option period. The CO neither issued a final decision nor informed Cessna when such decision would be issued within the sixty day time limit of Section 6(c) of the Contract Disputes Act ("CDA"), 41 U.S.C. § 605(c).[4] Cessna appealed this deemed denial to the Board.[5]

Before the Board, Cessna argued, *inter alia*, that: (i) the CO violated the Antideficiency Act and attendant regulations by obligating funds for the first and third years of the three-year option period prior to apportionment and allocation of the funds (Counts I and XIII); (ii) the CO's actions in deleting the proviso on the Financial Accounting Data Sheet rendered the option exercise ineffective (Count III); (iii) the Navy failed to exercise the option, in a timely manner, such that the contract was canceled (Count V); (iv) by exercising the option on October 1, 1988, the Navy required Cessna to provide voluntary services in violation of the Antideficiency Act (Count VI); and (v) the second and third option years were canceled because the CO did not issue a notice of funds availability prior to the beginning of the succeeding fiscal year (Counts VIII and XI).[6] *Cessna I*, 93–3 BCA at 128,880–81. In Count XIV, Cessna sought to recover compensation for services rendered during the option years based upon a theory of implied-in-fact contract. *Cessna II*, 96–1 BCA at 139,683.

In due course, the parties filed cross-motions for summary judgment with respect to Counts I, III, VIII, XI, and XIII. The Board granted the Navy's motion for summary judgment as to Counts I, III, and XIII, and

denied summary judgment to both sides on Counts VIII and XI. *Cessna I*, 93–3 BCA at 128,911. After a hearing on the merits, the Board issued a decision denying Cessna relief on Counts V, VI, VIII, and XI. *See Cessna II*, 96–1 BCA at 139,683, 139,701. In sum, the Board denied Cessna relief as to all of its claims pertinent to its appeal. This appeal followed.

## DISCUSSION

### I.

Pursuant to the CDA, 41 U.S.C. §§ 601–613 (1994), we review decisions of the Board under the following standard:

> the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b).

■ The Board's conclusions of law are reviewed *de novo*. *See Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 975 (Fed.Cir. 1997). Such legal conclusions include grants of summary judgment. *See Confederated Tribes of Colville Reservation v. United States*, 964 F.2d 1102, 1107 (Fed.Cir.1992) (noting that the grant of summary judgment is a legal conclusion).

■ The Board's decision on a finding of fact may not be set aside unless the appellant can meet its burden of establishing that the finding is arbitrary, capricious, so erroneous as to necessarily imply bad faith, or not supported by substantial evidence. *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984); *see William F. Klingensmith, Inc. v. United States*, 731 F.2d 805,

---

**4.** Section 605(c)(2) provides that "[a] contracting officer shall, within sixty days of receipt of a submitted certified claim over $100,000—(A) issue a decision; or (B) notify the contractor of the time within which a decision will be issued." 41 U.S.C. § 605(c)(2) (1994).

**5.** Section 605(c)(5) of the CDA provides in pertinent part that "[a]ny failure by the contracting officer to issue a decision on a contract claim

within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter." 41 U.S.C. § 605(c)(5) (1994).

**6.** While Cessna made other claims before the Board, those claims are not relevant to the present appeal and are not discussed in this opinion.

809 (Fed.Cir.1984); *J.M.T. Mach. Co. v. United States*, 826 F.2d 1042, 1046 (Fed.Cir. 1987). On appeal, Cessna makes the following contentions: (i) the Board erred in sus-taining the Navy's actions in obligating funds in advance of carrying out the apportionment process (Counts I and XIII); (ii) the Board incorrectly concluded that the option was properly exercised even though the CO deleted the proviso on the Financial Accounting Data Sheet (Count III); (iii) the Board erroneously determined that the option was timely exercised (Count V); (iv) the Board erred in concluding that the Navy did not require Cessna to perform voluntary services (Count VI); and (v) the Board incorrectly refused to give precedence to the Cancellation of Items clause and therefore erred in concluding that the second and third option years of the contract were not canceled (Counts VIII and XI). For the reasons set forth below, we reject Cessna's arguments.

## II.

■ Before reaching the merits of the appeal, we must address a preliminary issue raised by the Navy. Before the Board, the Navy argued that Cessna lacked standing to contest matters relating to the Navy's compliance with funding statutes. The Board rejected this challenge to its jurisdiction. The Board noted that under the CDA, it had jurisdiction "to decide any appeal from a decision of a contracting officer ... relative to a contract made by its agency." *Cessna I*, 93–3 BCA at 128,881 (citing 41 U.S.C. § 607(d)). The Board concluded that Cessna's appeal related to its contract with the Navy and that therefore Cessna's standing to bring the appeal and the Board's jurisdiction to decide it were "grounded in the provisions of the CDA." *Id.*

As it did before the Board, the Navy argues that the Antideficiency Act does not provide Cessna with a private right of action. Thus, it asserts that Cessna's appeal from the Board's decision regarding Counts I, III, VI, and XIII should be dismissed because those counts involve claims relating to the government's funding of its contractual obligations, and no private right of action exists under the Antideficiency Act with respect to such matters. Quoting from *Hagan v. Unit-*

ed States, 229 Ct.Cl. 423, 671 F.2d 1302 (1982), the Navy argues that the Antideficiency Act "sets forth its own discipline and penalties, and does not rely on private enforcement through Tucker Act litigation." *Id.*, 671 F.2d at 1305. We disagree.

As the Board noted, pursuant to 41 U.S.C. § 607(d), it has jurisdiction "to decide any appeal from a decision of a contracting officer ... relative to a contract made by its agency." *Cessna I*, 93–3 BCA at 128,881. Section 607(d) further provides that, "[i]n exercising this jurisdiction, the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the United States Court of Federal Claims."

Like the Board, we view Cessna's claims as "grounded in the CDA." Cessna's contract with the Navy was governed by the CDA, and it was under the CDA that Cessna submitted its claim to the contracting officer for additional compensation for work performed during the three year option period. The fact that Cessna argues that the Navy violated the Antideficiency Act and attendant regulations and the fact that Cessna seeks compensation from the Navy based upon a theory of implied-in-fact contract for services rendered during the option years do not mean that Cessna is seeking relief under the Antideficiency Act.

In *Gould, Inc. v. United States*, 935 F.2d 1271 (Fed.Cir.1991), Gould, Inc. ("Gould") was awarded a five-year contract by the Navy to build tactical radios. *Id.* at 1272. During contract performance, Gould encountered unanticipated difficulty in designing a radio that met the contract's performance requirements. *Id.* As a result, it submitted a claim to the contracting officer seeking to recover the costs it allegedly incurred in achieving adequate design. *Id.* Gould based its theory of recovery in part on the contention that the government had violated 10 U.S.C. § 2306(h)(1), by failing to supply a "stable design" for a multiyear procurement. According to Gould, this meant that the contract was illegal from its inception. *Gould*, 935 F.2d at 1272. After the contracting officer denied the claim, Gould appealed to the United States Claims Court.[7] In due course,

---

**7.** The Claims Court was renamed the Court of     Federal Claims pursuant to § 902 of the Federal

the court granted the government's motion to dismiss under Rule 12(b)(4) of the court, for failure to state a claim upon which relief could be granted. *Id.* at 1273. On appeal by Gould, we vacated the dismissal and remanded the case for further proceedings. *Id.* at 1276. In so doing, we held that Gould's complaint contained sufficient facts to state a claim upon which relief could be granted. *Id.* at 1275–76.

Upon remand, the government filed a motion to dismiss for lack of jurisdiction. The Court of Federal Claims granted the motion. The court read Gould's complaint as based solely on a contract with the United States but at the same time as alleging that there was no "stable design" and that the contract was illegal. Under these circumstances, the court reasoned, the only possible basis for contract jurisdiction was a contract implied in law, but such a contract was not within the court's jurisdiction. *Gould, Inc. v. United States,* 29 Fed. Cl. 758, 761 (1993). Again, Gould appealed.

On appeal, we held that the trial court had erred in dismissing Gould's complaint for lack of jurisdiction. *Gould, Inc. v. United States,* 67 F.3d 925 (Fed.Cir.1995). Noting that Gould relied on its underlying contract with the Navy as a basis for jurisdiction in the Court of Federal Claims, we stated that "there is no question that Gould's complaint alleges the existence of express contract, albeit one entered into allegedly in violation of 10 U.S.C. § 2306(h)(1)(D)." *Id.* at 929. We concluded: "This is sufficient ... to confer jurisdiction in the Court of Federal Claims." *Id.* We also concluded: "[E]ven if Gould's allegations of express contract are insufficient, Gould's amended complaint, when viewed in a light most favorable to Gould, alleges the existence of implied-in-fact contract—a separate basis for jurisdiction in the

Court of Federal Claims." *Id.* at 930. Accordingly, we again vacated the trial court's decision and remanded the case for further proceedings.

Similarly, in this case, Cessna argues that the Navy's actions in exercising the option in 1988 violated the Antideficiency Act, thereby rendering the option exercise inoperative and canceling the contract. However, Cessna contends, because it supplied services that the Navy accepted and from which the Navy benefited, after all legal requirements had been met (because the appropriations process had been completed), it is entitled to recover under implied-in-fact contracts for each of fiscal years 1989, 1990, and 1991. Under these circumstances, Cessna has put forth a cognizable claim for relief. *See American Telephone and Telegraph Co. v. United States,* 124 F.3d 1471, 1479 (Fed.Cir. 1997) ("An implied-in-fact contract arises when, in the absence of express contract, the parties' behavior leaves no doubt that what was intended was a contractual relationship permitted by law."). Cessna's claims in Counts I, III, VI, and XIII were properly before the Board.[8]

Having concluded that Cessna's claims on appeal with respect to Counts I, III, VI, and XIII are properly before us, we turn to the merits.

## III

### A.

By way of background, the Antideficiency Act finds its origins in a statute enacted in 1870, known as the Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251. The statute addressed the problem that Executive Branch officials were obligating funds before they were appropriated by Congress, and then making deficiency requests for appro-

---

Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, 4516 (1992), effective October 29, 1992.

8. The Navy's reliance on *Hagan* is misplaced. In that case, the plaintiff, Richard Hagan, sought monetary recovery for services provided while serving on a grievance panel. *Hagan,* 671 F.2d at 1304. Hagan alleged that the government violated the prohibition against its acceptance of voluntary services under 31 U.S.C. § 665(b)—the predecessor to present 31 U.S.C. § 1342—which made it illegal for him to sit on the grievance

panel. *Id.* at 1305. The United States Court of Claims noted that there was no express contract, and it also rejected any theory of implied-in-fact contract because there plainly was no consensual agreement between Hagan and the government for Hagan's services. *Id.* at 1304. By contrast, in this case, Cessna made a nonfrivolous allegation that the government violated a statute, thus rendering the contract void, and that the services Cessna provided during the option years were done so under a consensual agreement with the government, thereby giving rise to implied-in-fact contract.

priations that Congress had little choice in deciding because government agencies had basically committed the United States to make good on its promises. *See, e.g.,* 59 Comp. Gen. 369, 372 (1980).

■■■■ The present version of the Act, found at 31 U.S.C. § 1341 (1994),[9] provides in pertinent part as follows:

§ 1341. Limitations on expending and obligating amounts

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not -

(A) make or authorize expenditure or obligation exceeding amount available in appropriation or fund for the expenditure or obligation;

(B) involve either government in a contract or obligation for the payment of money before appropriation is made unless authorized by law.

Generally, the Act prohibits government officials and employees from making expenditures or incurring obligations in excess of available appropriations or in advance of appropriations. *See Blackhawk Heating & Plumbing Co. v. United States,* 224 Ct.Cl. 111, 622 F.2d 539, 542 n. 4 (1980). As far as government contracts are concerned, the Act "bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, existing appropriation." *Hercules Inc. v. United States,* —— U.S. ——, ——, 116 S.Ct. 981, 987, 134 L.Ed.2d 47 (1996).

By its terms, the Antideficiency Act restricts the ability of the government to enter into multi-year contracts because funds generally cannot be obligated beyond the current fiscal year. This led to problems in the area of military procurement, as described in the following passage from a Senate Report:

Some services and supplies now being procured with appropriations available for only 1 year require substantial investment by the contractor for equipment having a useful life longer than 1 year, or extensive investment in the hiring and training of personnel. These contracts are for such activities as base maintenance, aircraft and equipment overhaul, vehicle repair, and pilot training. If the contractor can obtain only a 1–year contract, his quoted price must cover all these expenses or he runs the risk of never recovering his unamortized investment if he loses the contract for the ensuing year or years. In such circumstances, however, a successful contractor is in a position to underbid competitors in later years since the competitors must include in their bid prices the same initial investment costs that the contractor confronted. As a result, competition is reduced and the Government can be overcharged in later years.

S. Rep. No. 90–1313, at 1–2 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2480, 2480–81.

To address these concerns, 10 U.S.C. § 2306(g) was enacted; it permits the government to enter into specified types of military procurement contracts having performance periods of up to five years, with option to extend performance by a period not exceeding three additional years.[10] If funds are not in fact appropriated in a subsequent

---

9. While the central provision of the Act is found at 31 U.S.C. § 1341, other provisions have been passed to supplement this provision, including 31 U.S.C. §§ 1342, 1501–1519 (1994).

10. Section 2306(g) provides in relevant part:

(g)(1) The head of an agency may enter into contracts for periods of not more than five years for the following types of services (and items of supply related to such services) for which funds would otherwise be available for obligation only within the fiscal year for which appropriated -

. . . .

(C) specialized training necessitating high quality instructor skills (for example, pilot and other aircrew members; foreign language training);

. . . .

whenever he finds that -

(i) there will be a continuing requirement for the services consonant with current plans for the proposed contract period;

(ii) the furnishing of such services will require a substantial initial investment in plant or equipment, or the incurrence of substantial contingent liabilities for the assembly, training, or transportation of a specialized work force; and

(iii) the use of such a contract will promote the best interests of the United States by encouraging effective competition and promoting economies in operation.

(2) In entering into such contracts, the head of the agency shall be guided by the following principles:

. . . .

fiscal year, section 2306(g)(3) provides that the "contract shall be canceled or terminated."

**B.**

■ Cessna's first contention is that the Antideficiency Act, in combination with its implementing regulations and certain other funding statutes, prohibits funds from being obligated before they have been both appropriated by the Congress and apportioned by the Executive Branch.[11] Cessna argues that 31 U.S.C. § 1512, which requires that appropriated funds be apportioned,[12] and 31 U.S.C. § 1517, which prohibits government officials or employees from authorizing obligations that exceed apportionment,[13] prevent the obligation of funds, even if appropriated, before they have been apportioned. As a general matter, Cessna maintains that permitting funds to be obligated in *advance* of

apportionments is inconsistent with prohibiting funds from being obligated in *excess* of apportionments. If no apportionment has been made, Cessna contends, any obligation necessarily exceeds the approved apportionment (of zero).

As further support for its position, Cessna points to the Department of Defense ("DOD") Accounting Manual, page 22–6, paragraph 4a, which states that:

> An apportionment or reapportionment is a distribution made by OMB [Office of Management and Budget] of amounts available for obligation in appropriation or fund account. Except in certain instances, . . . *apportionments and reapportionments by OMB are required before funds may be obligated.*

(emphasis added). In addition, Cessna cites to the Navy Comptroller Manual ("NCM"), paragraphs 073002(2) and 073100,[14] as estab-

---

(B) Consideration shall be given to the desirability of obtaining an option to renew the contract for a reasonable period not to exceed three years, at prices not to include charges for plant, equipment and other non-recurring costs, already amortized.

**11.** Cessna further contends that the funds must be allocated, allotted, and suballotted to the subagency level, and that the agency must commit the funds to a contract, before funds can be obligated to a contract.

**12.** Section 1512(a) provides:
(a) Except as provided in this subchapter, an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period. An appropriation for an indefinite period and authority to make obligations by contract before appropriations shall be apportioned to achieve the most effective and economical use. An apportionment may be reapportioned under this section.

**13.** Section 1517(a) provides that "[a]n officer or employee of the United States Government . . . may not make or authorize an expenditure or obligation exceeding—(1) an apportionment."

**14.** Paragraph 073002(2) states that:
On the basis of the enacted Department of the Navy appropriations, the Treasury Department prepares appropriation warrants which, after being countersigned by the General Accounting Office, are forwarded to the Department of the Navy as certification that the specific amounts are available for obligation and expenditure. Fund availability is established through compliance with procedures for sub-

mission, review, and Office of Secretary of Defense (OSD)/Office of Management and Budget (OMB) approval of apportionments and/or financial plans. In conjunction with the apportionment procedure, the Office of the Assistant Secretary of Defense (Comptroller) establishes the authorized level of obligation and expenditure for each appropriation, as well as any controls or limitations required below the appropriation level, as a means of requiring compliance with the terms of approved programs and budgets. In passing obligational authority (as an allocation or as a limitation within operating budget authority) to other echelons of command, the Comptroller creates administrative subdivisions of appropriated funds with clearly defined responsibility for 31 U.S.Code 1517 violations, i.e., for the creation of any obligation or making of any expenditure in excess of an apportionment or reapportionment, or of an amount specified in an administrative subdivision thereof. The process of distributing financial authority is continued through the chain of command in the form of suballocations, allotments, operating budgets, or operating targets. Allotments, as well as the specified obligational authority within operating budgets, constitute administrative subdivisions of appropriated funds, subject to the sanctions of the Anti-Deficiency Act (31 U.S.Code 1518 and 1519) for the holders of allotments or operating budgets. Operating targets (e.g., those established for individual ships by type commanders) are administrative limitations of funds for which the legal responsibility is retained by the grantor.

Paragraph 073100 states, in pertinent part, that "[t]he action required to obtain release of appropriated funds by means of the apportion-

lishing a particular funding process wherein the first step is to apportion funds, after which they are allocated to the Secretary of Defense, and then allotted, suballotted, and committed to the Navy. Cessna asserts that because the CO attempted, on October 1, 1988, to exercise the option and to obligate funds before they had been apportioned, she acted without authority and the option exercise therefore was ineffective.

We reject Cessna's arguments. As noted above, 31 U.S.C. § 1341(a) prohibits the government from making expenditures or incurring obligations before funds have been appropriated. However, as for the apportionment process, addressed by 31 U.S.C. §§ 1511–1519, no such timing limitation exists. For example, section 1512 merely requires appropriations to be apportioned to prevent obligations at rates that could result in the need for a deficiency or supplemental appropriation. Section 1513 provides a time table for carrying out the apportionment process, but is silent on the issue of whether the apportionment process must be carried out before obligations can be incurred. For its part, section 1517 prohibits government officials or employees from authorizing obligations that exceed apportionments, but says nothing about incurring obligations prior to carrying out the apportionment process. In sum, the relevant statutory provisions do not prohibit government agencies from incurring contractual obligations before completing the apportionment process. The remaining sections pertaining to apportionments are similarly silent.

This same reasoning applies to paragraphs 073002(2) and 073100 of the NCM; these paragraphs say nothing about the timing of incurring obligations versus carrying out the apportionment process. Therefore, they are of no assistance to Cessna. In addition, we note that paragraph 022064 of the NCM, entitled "Availability of Funds Prior to Apportionment," contemplates the possibility of incurring obligations before apportionment. It states:

> After the beginning of the fiscal year and prior to the specific allocation of funds pursuant to apportionment to the head of the responsible office . . . the head of the

ment process is the initial step in the budget

responsible office is authorized by the Comptroller of the Navy to suballocate funds and to issue allotments under any appropriation act of such fiscal year in such amounts as will not exceed the amount contained in the appropriation warrant or the request for apportionment and allocation submitted to the Comptroller of the Navy. . . . Upon issuance of the approved budget activity allocations pursuant to apportionment, the limitations of such allocations will apply to all suballocation and allotment action taken prior to the receipt of such budget activity allocations.

The provision permits allotments and suballotments to be issued before apportionment, with restrictions as to their amounts. It would logically follow that obligations may also be incurred, with the same amount restrictions.

Finally, we turn to the DOD Accounting Manual, paragraph 4a, page 22–6 ("paragraph 4a"). Initially, we assume, without deciding here, that this provision could be properly considered a regulation. We must still determine whether the provision is a binding regulation, whose breach a contractor may assert against the government. The primary intent of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation. *See generally Rough Diamond Co. v. United States*, 173 Ct.Cl. 15, 351 F.2d 636, 640, 642 (1965). We have stated that "if government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence, or failure to protest." *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1552 (Fed.Cir.1995) (citing *Chris Berg, Inc. v. United States*, 192 Ct.Cl. 176, 426 F.2d 314, 317 (1970) and *Rough Diamond*, 351 F.2d at 639–43); *see Applied Devices Corp. v. United States*, 219 Ct.Cl. 109, 591 F.2d 635, 640–41 (1979). However, if the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's failure to comply with that statute or

execution phase."

1452

regulation, even if that party derives some incidental benefit from compliance with it. *See Rough Diamond,* 351 F.2d at 642; *Hartford Accident & Indemnity Co. v. United States,* 130 Ct.Cl. 490, 127 F.Supp. 565, 567 (1955).

In this case, paragraph 4a is primarily intended to benefit the government, not contractors such as Cessna. The provision is best described as internal operating provision for the management of funds within the agency. In *Blackhawk Heating & Plumbing Co. v. United States,* 224 Ct.Cl. 111, 622 F.2d 539 (1980), the Court of Claims rejected the argument that the Antideficiency Act places restrictions not only on the amount being appropriated, but also on the administrative divisions made with respect to the appropriations. *Id.,* 622 F.2d at 552 n. 9. The court stated that such administrative barriers "are purely of in-house accounting nature and, as such are irrelevant to any determination respecting the availability of appropriated funds." *Id.* Paragraph 4a encourages Navy officials to follow particular administrative procedures to ensure that obligated funds are properly accounted for, thereby preventing officials from obligating more funds than have been appropriated.

We also find instructive the Supreme Court's reasoning in *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). In that case, the Interstate Commerce Commission ("ICC") had promulgated rules pertaining to processing applications for granting motor carriers temporary operating authority. *Id.* at 534, 90 S.Ct. at 1290. One of those rules required applicant for such authority to submit with its application a supporting statement containing certain specified information. *Id.* In the application of one motor carrier, the supporting statement accompanying the application failed to contain some of the required information. *Id.* at 537, 90 S.Ct. at 1292. In due course, despite the application's deficiencies, the ICC granted

the motor carrier temporary operating authority. *American Farm Lines,* 397 U.S. at 536, 90 S.Ct. at 1291. This grant was challenged by other motor carriers on the ground that the ICC failed to "require strict compliance with its own rules." *Id.* at 537, 90 S.Ct. at 1291. In upholding the ICC's decision, the Court noted that the rules in question were not intended to confer important procedural benefits on individuals in the face of unfettered agency discretion. *Id.* at 538–39, 90 S.Ct. at 1292. Therefore, the Court stated, there was no reason to depart from the general principle that " '[i]t is always within the discretion of . . . administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.' " *Id.* at 539, 90 S.Ct. at 1292 (quoting *NLRB v. Monsanto Chem. Co.,* 205 F.2d 763, 764 (8th Cir.1953)); *see also Contel Page Servs., Inc.,* ASBCA No. 32100, 87–1 BCA ¶ 19,540, at 98,736, 1986 WL 20366 (1986) (finding that a FAR regulation requiring the CO to determine that funds were available before exercising option related to internal procedures and did not create any rights in the contractor, and therefore the CO's failure to make the determination would not render the exercise of the option ineffective). Paragraph 4a represents such internal procedural rule. Cessna may not rely on this provision as evidence that the government violated the Antideficiency Act in obligating funds before they were apportioned.

■ Thus, we hold that the CO's exercise of the option did not violate the Antideficiency Act even though funds were obligated before they were apportioned.[15]

C.

■ Cessna next contends that section H–6—the option clause that required the Navy to exercise the option "not later than 1 October 1988"—must be interpreted to have required the Navy to exercise the option by September 30, 1988, which the Navy failed to

15. As noted, Cessna also contends that the option exercise was deemed ineffective because the CO acted without authority in deleting the proviso on the Financial Accounting Data Sheet and then exercising the option. Cessna's contention is without merit. The proviso provided that execution of the data sheet was conditioned upon the passage of the relevant appropriation act. This condition was automatically satisfied when the President signed the appropriation act. Therefore, in substance, the condition had been satisfied, and it made no difference whether or not the CO deleted the proviso before executing the data sheet.

do. First, Cessna argues that because funding for the original contract term expired at midnight on September 30, 1988, the contract ceased to exist at that point and "[o]nce the contract ceased to exist, the option ceased to exist." Therefore, the deadline for proper exercise of the option had to be September 30, 1988. Second, Cessna contends that permitting the Navy to exercise the option on October 1, 1988, would yield illegal result. Cessna states that the Navy forced it to provide services between midnight on September 30, 1988, when funding ceased under the original contract, and the evening of October 1, 1988, when the option was purportedly exercised. Requiring Cessna to perform services in the absence of a contractual obligation would violate the prohibition against voluntary services set forth in 31 U.S.C. § 1342.[16] In this case, Cessna contends, such services included providing the support needed in order to fly aircraft and operate flight simulators, retaining personnel at the site, and performing maintenance services to maintain aircraft, radar, simulators, spare parts, etc. Cessna states that in order to sustain the validity of the contract, the option clause should be interpreted to have required the Navy to exercise the option by September 30, 1988.

We disagree. First, the option clause states that the Navy had to exercise the option "not later than 1 October 1988." We give effect to a plain reading of the clause, which is that the Navy had up until and including October 1, 1988, to exercise the option. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996);

*Triax–Pacific v. Stone,* 958 F.2d 351, 354 (Fed.Cir.1992). Furthermore, the option did not cease to exist just because the original term of performance under the contract expired at midnight on September 30, 1988. Rather, the option remained viable until October 1, 1988, on which date it was exercised by the Navy. The Navy's ability to exercise the option was not tied to the original performance period of the contract.

■ Neither was Cessna compelled to perform voluntary services between midnight on September 30 and the evening of October 1, 1988. The Board made a finding of fact that "there is no evidence that the Navy proposed, directed or encouraged Cessna to incur rental and subcontractor costs." *Cessna II,* 96–1 BCA at 139,699. Cessna has not shown that the finding is unsupported by substantial evidence. *See Koppers Co. v. United States,* 186 Ct.Cl. 142, 405 F.2d 554, 557–58 (1968). Moreover, to the extent that Cessna may have maintained personnel and equipment at the site during the period in question, it has not shown either that the Navy requested or compelled it to do so or that the Navy accepted those services in violation of section 1342. Rather, Cessna itself chose to perform these services in anticipation that the Navy might exercise the option on October 1, 1988. Not having accepted the services, the government is not responsible for subsidizing them.[17]

## D.

■ Cessna's final argument is that the Navy's exercise of the second and third op-

---

16. Section 1342 provides in pertinent part that "[a]n officer or employee of the United States Government ... may not accept voluntary services for [the] government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342 (1994).

17. Cessna further argues that even if the Navy had until October 1, 1988, to exercise the option, Cessna did not receive notice of the option exercise until October 3, 1988, rendering the option exercise untimely. In that regard, Cessna challenges the Board's finding of fact that Cessna and the CO reached an agreement that sending the option modification by facsimile would be acceptable, and Cessna also challenges the Board's reliance on the Navy's statement to Cess-

na personnel on September 30 to wait by their facsimile machines on October 1 to receive the option exercise. *See Cessna II,* 96–1 BCA at 139,698.

We disagree. A Cessna official acknowledged that the parties had an established practice of faxing modifications. *Cessna II,* 96–1 BCA at 139,688. Therefore, notice was effective upon receipt of the facsimile at Cessna's office on October 1, even though Cessna personnel chose not to be in the office at that time to receive the facsimile. *See id.* at 139,689. Furthermore, to the extent that Cessna's arguments are directed to witness credibility determinations of the Board, we find no compelling reason to alter those determinations. In that regard, we have stated that credibility determinations are "virtually unreviewable." *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1583 (Fed.Cir.1996).

tion years, on October 1, 1989, and October 1, 1990, respectively, were ineffective. Cessna contends that the Cancellation of Items clause of the contract conflicts with section H–8 of the contract Schedule because the former clause stated that the contract was canceled if the CO did not notify the contractor prior to the beginning of the next succeeding fiscal year that funds were available for performance in the succeeding year, while the latter clause permitted the CO to notify Cessna of the availability of funds on the first day of the succeeding fiscal year. In basic terms, Cessna asserts, the Cancellation of Items clause required the Navy to provide it notification by September 30, 1988, while section H–8 gave the Navy until October 1.

Furthermore, Cessna argues that the Cancellation of Items clause was a mandatory clause required to be included in all multi-year contracts pursuant to DAR § 1–322.6(c),[18] and that section H–8 constitutes a deviation from the Cancellation of Items clause under DAR § 1–109.1(i).[19] Under those circumstances, says Cessna, DAR § 1–109.2 required that the Navy obtain authority before implementing the deviation, which was not done.[20] Cessna asserts that the failure to obtain a deviation rendered section H–8 unenforceable and that therefore the Navy's exercise of the second and third option years was ineffective.

We reject Cessna's arguments. Initially, as a contractual matter, section H–8 took precedence over the Cancellation of Items clause. In that regard, the Order of Precedence clause of the contract stated as follows:

> In the event of inconsistency in this contract, unless otherwise provided herein, the inconsistency shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the Specifications); (b) General Provisions; (c) the other provi-

sions of the contract whether incorporated by reference or otherwise; and (d) the Specifications and (e) the Contractor's proposal No. CMP–1351.

In this case, section H–8 was found in the contract's schedule, while the Cancellation of Items clause was a general provision. *See Cessna II*, 96–1 BCA at 139,699. However, as Cessna points out, we must further consider the propriety of including section H–8 in the contract at all because it deviated from the DAR-mandated Cancellation of Items clause, and the Navy did not seek authorization for its inclusion.

Cessna's argument on this point suffers from the same defect as its first contention on appeal—that appropriated funds must be apportioned before they are obligated. We conclude that the primary purpose behind the Cancellation of Items clause is to protect the government's interest by encouraging government officials to monitor the availability of funds for each fiscal year and to provide notice to contractors accordingly. Consequently, the clause may not form the basis for a contractor's right of action. In order for contract performance to continue each year, the Cancellation of Items clause required that the CO notify the contractor that funds would be available for the succeeding fiscal year, act which inherently required the CO to first ensure that sufficient funds are in fact available. *See* DAR § 7–1903.33(d).

In *ITT Federal Lab., A Division of IT&T Corp.*, ASBCA No. 12987, 69–2 BCA ¶ 7849, at 36,490, 1969 WL 788 (1969), *rev'd on other grounds*, 197 Ct.Cl. 11, 453 F.2d 1283 (1972), the contract in dispute contained two clauses: (i) a Limitation of Price and Contractor Obligations clause, which, in general, required the contracting officer to notify the contractor when funds became available for the succeeding program year, and limited the con-

---

**18.** Section 1–322.6(c) states that DAR § 7–1903.33(d)—the Cancellation of Items clause—must be included in multi-year service contracts. The analogous FAR provision is 48 C.F.R. § 17.109(a) (1996).

**19.** Section 1–109.1(i) defines deviation to include the situation where "a contract clause is set forth in ASPR [Armed Services Procurement Regulation] for use verbatim, [and] a contract clause covering the same subject matter which varies

from the ASPR coverage [is used]." The analogous FAR provision is 48 C.F.R. § 1.401 (1996).

**20.** Section 1–109.2 states that deviations from the regulations affecting only one contract or procurement may be authorized provided that (i) the circumstances justify a deviation, and (ii) written notice of the deviation is furnished to particular agency officials. The analogous FAR provision is 48 C.F.R. § 1.403 (1996).

tractor's obligations until such notice was given; and (ii) a Cancellation of Items clause, which was substantively the same as the Cancellation of Items clause at issue in this case. *ITT*, 69–2 BCA at 36,485–86. The Board referred to these provisions collectively as "notice of availability of funds" provisions. *Id.* at 36,490. In the course of deciding whether the government had complied with these notice provisions, the Board determined that a primary purpose of the provisions was "to give [the government] control over the timing of future expenditures of appropriated funds, a provision necessary in the light of the practices by which Congress exercises budgetary control."[21] *Id.*

The Navy apparently deviated from the Cancellation of Items clause in drafting section H–8 without first obtaining the proper authority to do so. However, because the Cancellation of Items clause is primarily for the benefit of the government, Cessna may not rely on the deviation in arguing that the Navy's exercise of the options for fiscal years 1990 and 1991 was ineffective. Thus, Cessna is bound by section H–8, and there is no dispute that the Navy fully complied with the section.

## CONCLUSION

For the foregoing reasons, the decision of the Board is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

---

**21.** The Board in *ITT* also stated that another primary purpose was "to relieve [the contractor] of any obligation to incur production costs for successive years until funds were assured from which to pay [it]." *ITT*, 69–2 BCA at 36,485–86. However, this stated purpose related not to the contract's Cancellation of Items clause, but rather related to its Limitation of Price and Contrac- tor Obligations clause, subsection (d), which stated in pertinent part that "[t]he Contractor is not obligated to incur costs for the performance re- quired for any Program Year after the first unless and until he has been notified in writing by the Contracting Officer of an increase in availability of funds." ASPR § 1–322.4(a)(1966).