**FREIGHTLINER CORPORATION,**
Appellant,

v.

**Louis CALDERA, Secretary
of the Army, Appellee.**

No. 99–1217.

United States Court of Appeals,
Federal Circuit.

Sept. 6, 2000.

Thomas L. McGovern, III, Hogan & Hartson, L.L.P., of Washington, DC, argued for appellant. With him on the brief were William A. Bradford, and Joy E. Sturm.

James C. Caine, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; and Robert E. Kirschman, Jr., Assistant Director. Of counsel was Scott Lind, Lt. Col., Department of the Army–JALS–CA, of Arlington, Virginia.

Before MAYER, Chief Judge, SCHALL and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

On appeal, Freightliner Corporation ("Freightliner") seeks an equitable adjustment of $15,598,353, arguing that the United States Army Tank–Automobile Command's ("TACOM's" or "Government's") option exercise in the last year of a five-year multiyear contract was ineffective. The Armed Services Board of Contract Appeals ("the Board") denied Freightliner's claim. We affirm.

## I. BACKGROUND

On October 31, 1984, TACOM awarded Freightliner a five-year multiyear contract for the supply of Small Emplacement Excavator ("SEE") vehicles. The contract provided for the delivery of a basic quantity of tractors for each of the five program years, spanning from 1984 to 1988. The contract designated 922 SEE vehicles as the basic quantity, with a schedule of 12 vehicles in the first program year (1984), 230 vehicles in the second program year (1985), 201 vehicles in the third program year (1986), 163 vehicles in the fourth pro-

gram year (1987), and 316 vehicles in the fifth program year (1988).

The contract also included an option provision allowing TACOM to order up to an additional 200% of the basic quantity of SEE vehicles within each program year. Thus, in the fifth program year, TACOM had the option of ordering an additional 632 vehicles. The option provision provided, in relevant part, as follows:

a. The Government shall have the option to increase the quantity of each CLIN [contract line item number] within each Program Year by an additional quantity not to exceed 200% of the initial quantity of vehicles specified for each CLIN for all five program years.

b. The option to increase quantities may be exercised in one or more increments by giving written notice thereof to the contractor, subject to the following constraints:

(1) The Government's right to exercise its option for vehicles for any given CLIN shall expire upon Government acceptance of 50% of the vehicles initially specified for each program year (exclusive of any option vehicles).

(2) Unless the parties otherwise agree, the deliveries of vehicles added by exercise of option shall commence 180 days after exercise and at a monthly rate of 200% of the maximum monthly rate of the CLIN against which the option is being exercised, but in no event shall exceed a maximum monthly rate of 66 vehicles per month.

(3) The unit price(s) to be paid for vehicles added by option exercise shall be no higher than the original unit price specified in the contract. . . .

The provision therefore stipulates that, unless the parties agreed otherwise, delivery of the optional vehicles would begin 180 days following the option exercise, and the unit price for each optional vehicle would be no higher than the unit price of a basic quantity vehicle.

The contracting officer funded the basic quantity of SEE vehicles for THE first program year with appropriations from fiscal year ("FY") 1984. The contracting officer also funded the option quantities with appropriations from various fiscal years that did not necessarily correspond to the appropriations used for the basic quantity from the same program year. Thus, for example, option quantities from the first program year were paid for with funds appropriated for FY 1984 and FY 1985.

On June 29, 1988, TACOM exercised its option in the fifth program year by ordering 82 SEE vehicles, which it funded with appropriations from FY 1987 and FY 1988. On September 21, 1988, TACOM exercised another option in the fifth program year by ordering 38 SEE vehicles, which it funded with appropriations from FY 1986 and FY 1987. Then, on January 5, 1989, the contracting officer issued unilateral modification P00051 ("the P00051 modification"), exercising another option in the fifth program year for 491 SEE vehicles. The P00051 modification stated that the "delivery schedule is to be negotiated and contractualized by 31 Mar. 89. The contractor must provide for a delivery proposal within 30 days following date of contract modification execution." The modification also indicated that the price would be $68,755 per vehicle. The accounting classification indicated that the option quantity would be paid with funds from FY 1987, FY 1988, and FY 1989.

On February 15, 1989, Freightliner informed the contracting officer that it believed that the P00051 modification was an ineffective exercise of the contract's option provision, and that it would treat the order as a constructive change order and seek an equitable adjustment. Then, under protest, Freightliner delivered the ordered vehicles.

On September 1, 1989, Freightliner submitted a certified claim to the contracting officer for reasonable costs and profits of

$17,860,305 resulting from TACOM's option order of 491 SEE vehicles. In particular, Freightliner asserted that the P00051 modification effectively extended the period of performance nearly a year beyond the original five-year contract because TACOM purchased quantities originally scheduled for a follow-up contract. On February 25, 1991, the contracting officer denied Freightliner's claim. Then, after revising the claim amount to $15,598,-353, Freightliner resubmitted its claim to another contracting officer, who issued a final decision denying the claim. Freightliner appealed the contracting officer's decision to the Board.

On November 26, 1993, the Board denied Freightliner's motion for summary judgment and also denied the Government's motion to dismiss count II of Freightliner's complaint, which alleged that TACOM had violated Defense Acquisition Regulation ("DAR") § 1–1502(e)'s limitation on using the option to procure a quantity beyond the Army's requirement for five years. *See Freightliner Corp.*, ASBCA No. 42982, 94–1 BCA ¶ 26,538 (*Freightliner I* ). Then on September 29, 1998, the Board denied Freightliner's remaining allegations and held that TACOM's option exercise was proper. *See Freightliner Corp.*, ASBCA No. 42982, 98–2 BCA ¶ 30,026 (*Freightliner II* ). In particular, the Board concluded that both parties understood the term "program year" to mean a "period of days in relation to the date of contract award" measured by specified dates for delivery of the basic quantities. *Id.* at 148,565. The Board found that TACOM had an existing requirement for SEE vehicles when it issued the P00051 modification. The Board also found that the P00051 modification was timely and within the option provision's quantity limits. *See id.* at 148,575.

On appeal, Freightliner asserts that it is entitled to an equitable adjustment for three independent reasons: (1) the P00051 modification violated Federal Acquisition Regulation ("FAR") § 17.207(f) (1989), requiring TACOM to follow noncompetitive procedures before exercising an option when the option price was not evaluated in an original competitive solicitation; (2) the P00051 modification violated DAR § 1–1502(e) (1984), which limited TACOM to using the option only for acquiring its requirements for five years; and (3) the P00051 modification did not comply with the contract's option provision with respect to quantity, delivery, and price terms.

## II. STANDARD OF REVIEW

■ Under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994), we review the Board's decision according to the following standard:

> [T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b). Accordingly, we review the Board's legal determinations *de novo, see Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 975 (Fed.Cir.1997), and we will not disturb the Board's factual findings unless they are not supported by substantial evidence. *See Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1446 (Fed. Cir.1997); *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1550 (Fed.Cir.1993); *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed.Cir. 1992) ("We ... defer to [the Board's] finding of fact unless unsupported by substantial evidence.") (citing *United States v. Dekonty Corp.*, 922 F.2d 826, 827 (Fed.Cir. 1991)).

## III. DISCUSSION

### A. FAR § 17.207(f)

■ On appeal, Freightliner contends that TACOM's failure to comply with FAR § 17.207(f) rendered TACOM's option exercise ineffective. When TACOM issued

the P00051 modification, the FAR regulation provided as follows:

> Before exercising an option, the contracting officer shall make a written determination for the contract file that exercise is in accordance with the terms of the option, the requirements of this section, and Part 6. To satisfy requirements of Part 6 regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract.

FAR § 17.207(f) (1989).

The above regulation explains that, before exercising an option, a contracting officer must satisfy the requirements in FAR § 17.207(f) and FAR Part 6; otherwise, the Government must treat the option order as a "sole source" procurement and justify it under an exception to the requirement of obtaining supplies under full and open competition. *See* FAR § 6.101 (1989). Freightliner asseverates that, because TACOM failed to satisfy the conditions in FAR § 17.207(f) and did not obtain approval for the sole source justification, the P00051 modification was an ineffective option order. TACOM responds that, even if it violated FAR § 17.207(f), that regulation was not enacted for the contractor's protection, and Freightliner therefore cannot avoid its contractual obligations based on an alleged violation of that regulation.

■ In order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor. *See Cessna*, 126 F.3d at 1451; *Rough Diamond Co. v. United States*, 173 Ct.Cl. 15, 351 F.2d 636, 640–42 (Ct.Cl. 1965). If, however, the regulation exists for the benefit of the Government, then the private contractor does not have a cause of action against the Government in the event that a contracting officer fails to comply with the regulation. *See Cessna*, 126 F.3d at 1451–52; *Rough Diamond*, 351 F.2d at 642. Furthermore, each regulation must be analyzed independently to determine whether it confers a cause of action upon the private contractor. *See Chris Berg, Inc. v. United States*, 192 Ct. Cl. 176, 426 F.2d 314, 317 (Ct.Cl.1970) (explaining that it is not "possible to determine that all of ASPR [predecessor to DAR] was or was not made for the benefit of bidders").

Read holistically, FAR § 17.207 is designed to ensure that a contracting officer exercises an option to fulfill existing needs, *see* FAR § 17.207(c)(2) ("The requirement covered by the option fulfills an existing Government need ...."), and that exercising the option presents the most cost effective manner of fulfilling that need, *see* FAR § 17.207(d) ("The contracting officer, after considering price and other factors, shall make the determination...."). The regulation does not proscribe the contracting officer from taking a particular action, rather it provides the Government with a mechanism for maintaining orderly business transactions. In particular, FAR § 17.207(f) serves as an internal operating procedure that requires a contracting officer to document the reasons for exercising the option and the procedural steps taken in doing so. FAR § 17.207(f) exists to ensure that the contracting officer acts in the best interest of the government; it therefore does not exist for the benefit of the contractor. *Cf. Cessna*, 126 F.3d at 1452 (holding that a regulation which prevented a contracting officer from obligating funds before they were appropriated constituted an internal operating procedure existing for the benefit of the government). Accordingly, we hold that, even if TACOM failed to comply with FAR § 17.207(f), it would not render the P00051 modification ineffective.

### B. DAR § 1–1502(e)

■ Freightliner also argues that the P00051 modification was ineffective because it violated DAR § 1–1502(e). Specifically, Freightliner asserts that TACOM violated the regulation by using money

from FY 1989 to pay for the vehicles ordered under the P00051 modification. As with Freightliner's first argument, the Government contends that even if it violated DAR § 1–1502(e), the regulation does not supply Freightliner with a cause of action to sue for noncompliance.

When the parties entered into the present contract, DAR § 1–322.1(g) (1984), the defense regulation that addressed the inclusion of options in multiyear contracts, provided as follows:

(1) Options may be used when some future requirements are definitive and additional quantities of supplies or services are likely, though not definitive as to amount.

(2) Options to increase quantities ... shall not exceed the period described in 1–1502(e).

*Id.* DAR § 1–1502(e), which addressed the exercise of options in multiyear contracts, provided that "the total of the basic and option quantities ... shall not exceed the requirement for five years in the case of supplies." *Id.*

DAR § 1–1502(e) serves as an internal operating procedure designed to prevent the Government from overspending by exercising options to order supplies in excess of its requirement. By tying the quantities that an agency can purchase to its need—"the total ... quantities shall not exceed the requirement"—the regulation seeks to ensure that an agency will not spend frivolously when demand for supplies does not exist. In effect, the regulation operates as an in-house accounting mechanism for managing funds and encouraging fiscal responsibility. As such, the regulation exists primarily for the benefit of the government, not private contractors such as Freightliner. *See Cessna*, 126 F.3d at 1452 (holding a regulation that concerned management of funds within an agency to be for the benefit of the government).

Moreover, any benefit that accrues to the private contractor from the Government's compliance with DAR § 1–1502(e) is peripheral. In the event that an agency

exercises an option and orders supplies beyond its requirement but pays the contracted price for that order, the private contractor cannot complain about which fiscal year appropriation was used to pay for the order. Indeed, the source of the funds used to pay for the order is purely an internal bookkeeping matter. To the extent the private contractor may suffer when an option is exercised because the cost of supplies exceeds the contracted price, that problem should have been accounted for when negotiating the original contract by either not including option provisions, setting a higher contracted price, or limiting the total amount of options quantities that an agency could acquire— as the parties did here.

C.  Terms of the Option Provision

██  Freightliner next contends that the P00051 modification constituted an ineffective option order because it deviated from the quantity, delivery, and price terms in the option provision. For an option order to be effective, the Government must exercise the option in exact accord with the terms of the contract. *See Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 323 (Fed.Cir.1997); *New England Tank Indus. of N.H., Inc. v. United States*, 861 F.2d 685, 687 (Fed.Cir.1988).

██  With regard to the quantity term, the option provision states that the "Government shall have the option to increase the quantity of each [contract line item number] within each Program Year by an additional quantity not to exceed 200% of the initial quantity of vehicles." In the present case, the Board found that TACOM had a need for the additional vehicles when it exercised the option, *see Freightliner I*, at 132,085, and that the P00051 modification was timely, *see Freightliner II*, at 148,575. Moreover, the P00051 modification comported with the quantity term because the amount of option vehicles ordered (491) was within the provision's quantity limit (632). Accordingly, we affirm the Board's holding that

TACOM did not violate the quantity term in the option provision.

■ With regard to the delivery term, the option provision states that "[u]nless the parties agree otherwise, the deliveries of the vehicles added by exercise of the option shall commence 180 days after exercise." Freightliner contends that the phrase "unless the parties agree otherwise" must be construed as requiring an agreement that predates the exercise of an option. As support for its position, Freightliner relies on the fact that, prior to the P00051 modification, every option was preceded by the parties' mutual negotiation. Contract interpretation presents a question of law that we review *de novo*. *See Lockheed*, 108 F.3d at 322.

We cannot agree with Freightliner's proffered interpretation of the delivery term because it adds an unnecessary interpretative gloss to the contract language. *See Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 413 (Fed.Cir.1988) (applying the plain language analysis of contract interpretation). The plain language of the option provision makes clear that the default delivery schedule—that delivery commence 180 days after option exercise—becomes effective absent the parties' agreement on an alternative schedule. The provision is devoid of any language requiring that delivery terms be negotiated prior to the option exercise. Rather, the provision allows the parties the flexibility to negotiate delivery schedules before or after the option exercise, or simply to fall back on the default delivery schedule. Furthermore, to the extent that earlier option orders were preceded by the parties' mutual agreement, that fact did not foreclose the Government's opportunity to exercise an option and then negotiate a delivery schedule at a later time.

Freightliner also argues that the decision in *General Dynamics Corp.*, ASBCA No. 20882, 77-1 BCA ¶ 12,504 (1977), compels a holding that TACOM did not comply with the delivery term. We find that argument unpersuasive, as *General Dynamics* is neither binding on this court nor apposite to the present case. In *General Dynamics*, the Government and a private contractor entered into a contract with an option clause stating that "[d]elivery of the items added by the exercise of this option shall continue immediately after, and at the same rate as delivery of like items called for in this contract, unless the parties otherwise agree." *Id.* at 77-1 BCA ¶ 12,504 at 60,620. During the course of the contract, the Government exercised one of its options, but it failed to negotiate with the private contractor and instead unilaterally imposed a delivery schedule that deviated from the default schedule. Accordingly, the Board held that the Government's option order was ineffective because it required, without negotiation, a delivery schedule different from the one prescribed by the contract.

Here, by contrast, the P00051 modification did not mandate a delivery schedule that deviated from the default schedule. In exercising its option through the P00051 modification, TACOM wrote Freightliner that the "delivery schedule is to be negotiated and contractualized by 31 Mar. 89. The contractor must provide for delivery proposal within 30 days following date of contract modification execution." This language invited Freightliner to submit a proposed delivery schedule to facilitate the negotiation of a new schedule by March 31, 1989. Nowhere did the P00051 modification alter or impair any terms in the option provision. Indeed, the P00051 modification operated as a request for an alternative delivery schedule rather than an imperative direction to comply with a new schedule that was not negotiated and different from the default schedule—as was the case in *General Dynamics*. The P00051 modification, when read together with the option provision, provided that delivery would occur either according to a new schedule if one were negotiated by March 31, 1989, or according to the default delivery schedule under the option provision. Thus, we hold that the P00051 modification complied with the delivery term.

With regard to the price term, the option provision states that the "unit price(s) to be paid for vehicles added by option exercise shall be no higher than the original unit price specified in the contract for the applicable vehicle line item against which the option is exercised." Freightliner asserts that the order was ineffective because the unit price for the applicable contract line item number was $68,950 per vehicle and TACOM exercised its option at a price of $175 less per vehicle. We find Freightliner's argument to be without merit. First, by its plain language, the option provision merely sets a ceiling price on an option vehicle, it does not preclude the Government from exercising an option order at a price lower than that paid for a basic quantity vehicle.

Additionally, the price listed in the P00051 modification complied with a previous contract modification agreed to by the parties. By virtue of bilateral modification P00046, the parties agreed to change the unit price from $69,350 per vehicle, as defined in the original contract, to $68,775 per vehicle. In doing so, the parties further stipulated that the "[c]ontract modification pages provided herein are substituted for like numbered/lettered pages or added to the contract in proper order." In particular, the P00046 modification specified a price of $68,775 for line item number 5001AA, which was in the original contract and applied to the fifth program year. As a result, the original unit price referenced by the option provision became $68,755, which is the same price that TACOM listed in the P00051 modification. Consequently, we also hold that the P00051 modification satisfied the price term.

### CONCLUSION

Because we hold that FAR § 17.207(f) and DAR § 1–1502(e) did not create a cause of action for Freightliner, and that the P00051 modification did not contravene any terms in the option provision, we affirm the Board's decision.

*AFFIRMED.*

### COSTS

Each party bears its own costs.