# United States Court of Appeals for the Federal Circuit

---

**TODD CONSTRUCTION, L.P.,**
(FORMERLY KNOWN AS **TODD CONSTRUCTION CO., INC.**),
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-5166

---

Appeal from the United States Court of Federal Claims in case no. 07-CV-324, Judge George W. Miller.

---

Decided: August 29, 2011

---

MARVIN LAWS, Hayes Magrini & Gatewood, of Oklahoma City, Oklahoma argued for plaintiff-appellant. With him on the brief was ROBERT L. MAGRINI.

MATTHEW H. SOLOMSON, Trail Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director.

_____

Before LINN, DYK, and PROST, *Circuit Judges.*

DYK, *Circuit Judge.*

Todd Construction, L.P. ("Todd") is a government con-tractor. Todd filed suit in the Court of Federal Claims ("Claims Court") under the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq.*, alleging that the United States Army Corps of Engi-neers (the "government") gave it an unfair and inaccurate performance evaluation. The Claims Court held that the CDA provided it with subject matter jurisdiction over such a claim, but dismissed Todd's complaint for lack of standing and failure to state a claim. *Todd Constr. L.P. v. United States*, 85 Fed. Cl. 34 (2008) ("*Todd I*"); *Todd Constr. L.P. v. United States*, 88 Fed. Cl. 235 (2009) ("*Todd II*"); *Todd Constr. L.P. v. United States*, 94 Fed. Cl. 100 (2010) ("*Todd III*"). We affirm both the Claims Court's determination that it had jurisdiction under the CDA and its dismissal of Todd's complaint on the grounds of lack of standing and failure to state a claim.

BACKGROUND

In 2003, Todd entered into two task order contracts with the government on two construction projects for roof repairs of government buildings. The parties refer to these projects as "Building 2121" and "Building 3611." The government agreed to amended completion dates, making the completion dates June 25, 2004, for the Build-ing 2121 project and July 30, 2004, for the Building 3611 project. Due to a series of delays (some of which Todd alleges were caused by its subcontractors, the govern-ment, or other circumstances outside of its control), the projects were not completed and accepted by the govern-

ment until September 30, 2005, and October 14, 2005, respectively.

At the time, the Federal Acquisition Regulations ("FAR") required that for "each construction contract" for "$550,000 or more," a "[performance] report shall be prepared . . . in accordance with agency procedures" and that "[e]ach performance report shall be reviewed to ensure that it is accurate and fair."[1]  48 C.F.R. § 36.201 (2006).  The government issued ER 415-1-17 to implement FAR § 36.201 and establish procedures for contractor performance evaluations.  *See* U.S. Army Corps of Engineers Regulation 415-1-17 ("ER 415-1-17").  That regulation, inter alia, required: (1) "[N]oti[ce] [to] the contractor . . . of the performance elements against which his performance will be evaluated;" (2) a conference with the contractor prior to the issuance of interim unsatisfactory performance ratings; (3) "re-evaluation of [any] interim unsatisfactory rating every three months;" (4) and issuance of a final evaluation within sixty days of "substantial completion of the work." *Id.* 415-1-17(5)(a)–(c).  It also permitted contractors to "submit written comments, which should be addressed and included in the report," and allowed contractors to appeal a final unsatisfactory performance evaluation "to one level above the Contracting Officer." *Id.* 415-1-17(5)(c)(2), (3)(f).  The regulation explained that the evaluations would typically be prepared by the "resident engineer" and reviewed and approved by the contracting officer. *Id.* 415-1-17(5)(c)(1).

---

[1]   In 2009, the regulation was amended and no longer contains the same language.  The FAR regulatory requirements for performance evaluations for government contracts in general (rather than merely construction contracts) can currently be found at 48 C.F.R. § 42.1502.  We consider the regulation as it existed during the pertinent events of this case.

This was apparently the case with Todd's evaluations. The final evaluations are filed in a central database where the information is stored for at least six years. 48 C.F.R. § 36.201(c); ER 415-1-17(5)(c)(1). The information is then used by contracting officers in determining future contract awards. *See* 48 C.F.R. §§ 42.1501–1503.

Todd received negative interim performance evaluations from the resident engineer for both projects on February 5, 2004. On March 26, 2006, the resident engineer issued his proposed negative final performance evaluations for both projects pursuant to 48 C.F.R. § 36.201 and ER 415-1-17. On April 20, 2006, Todd submitted comments protesting the proposed evaluations. These comments primarily took issue with the purported lack of timeliness of its performance, asserting that its subcontractors and "other problems" that were "beyond Todd's control" caused the delays. J.A. 41–43. Todd also asserted that it "took extraordinary steps to supervise, manage, coordinate and control its subcontractors," that it was "responsive to the Government's concerns," and that its "quality control system" was adequate. *Id.* The evaluations were not changed as a result of Todd's comments.

In the final performance evaluations, the resident engineer assigned Todd an overall performance rating of unsatisfactory. The resident engineer also assigned unsatisfactory ratings for each project in fifteen individual performance categories. Many of these categories (e.g., "adherence to approved schedule," "correction of deficient work in a timely manner," and "resolution of delays") related to the timeliness of Todd's performance. J.A. 35. Todd was also given unsatisfactory ratings in categories such as "coordination and control of subcontractor[s]," "quality of workmanship," "management of resources/personnel," and "cooperation and responsiv-

ness." *Id.* The resident engineer also included specific comments expanding on the negative ratings. For example, the resident engineer stated that "[the] [f]irst submittal was not received until 22 Dec 03," that the "[c]ontractor did not start work until the week of 29 March 04," and that the "[c]ontractor's quality control system allowed subcontractors to field paint damaged roof panels without government approval." *Id.*

Following internal reviews within the Department of the Army, the final evaluations were issued on July 23, 2006. Todd sought review by the contracting officer. On April 25, 2007, the contracting officer issued a "final decision regarding [Todd's] performance," concluding that "the [u]nsatisfactory performance appraisal [was] justified and all required procedures were followed." J.A. 59.

On May 25, 2007, Todd filed a complaint in the Claims Court, alleging that the government failed to follow the proper procedures and that the unsatisfactory performance evaluations were arbitrary and capricious and seeking, inter alia, a declaratory judgment. In this complaint, Todd did not challenge any particular performance ratings. Instead, it merely pled that the government issued overall unsatisfactory performance evaluations and that these ratings were arbitrary and capricious. In an initial opinion, the Claims Court held that it had subject matter jurisdiction over the suit under the CDA because the claim that the performance evaluations were inaccurate and improper "relat[ed] to the contract," as required by the CDA. *Todd I*, 85 Fed. Cl. at 44–45. However, it also determined that the complaint failed to state a claim for relief under Court of Federal Claims Rule 12(b)(6). *Todd II*, 88 Fed. Cl. at 249–50.

On August 14, 2009, Todd filed its amended complaint as permitted by the Claims Court. Although Todd added

a series of factual allegations, it again did not specifically identify which unsatisfactory ratings were arbitrary and capricious. The complaint appeared to challenge primarily the unsatisfactory ratings related to Todd's timeliness of performance.[2] For each project, Todd asserted that particular delays were caused by its subcontractors, the government, or other "unforeseeable event[s] [ ] not caused by Todd." J.A. 108. For example, it alleged that it had to terminate a subcontractor for default because of unsatisfactory performance; that the government delayed decisions about how to approach differing site conditions discovered at one project site; and that forty days of inclement weather made work impracticable during one period. In sum, Todd alleged that there were "significant problems with the . . . unsatisfactory ratings on account of the delays which were caused by unforeseen events, many of which were neither the fault nor the responsibility of Todd." J.A. 113. Todd also alleged that the government failed to comply with the procedural requirements of ER 415-1-17.

In its third and final opinion, the Claims Court reaffirmed that it had subject matter jurisdiction over Todd's complaint. *See Todd III*, 94 Fed. Cl. 107–112. However, the Claims Court also held that Todd lacked standing to sue for the alleged procedural violations because "there [was] no discernible injury to the plaintiff from the error." *Id.* at 113. With respect to Todd's claim that the performance evaluation was unfair and inaccurate, the Claims

---

[2]    The only apparent exception was a conclusory statement that Todd's problems with its subcontractors were not "a reflection on [its] management or supervisory capabilities." J.A. 108, 110. This statement appeared to take issue with its negative evaluation for "coordination and control of subcontractor[s]" and "effectiveness of job site supervision." *Id.* at 114.

Court held that Todd did have standing. *Id.* at 107–112. However, the court held that Todd failed to state a claim under Rule 12(b)(6) because Todd was responsible for the acts of its subcontractors as a matter of law and "there [was] nothing in the amended complaint beyond Todd's bare assertion of non-responsibility to support any conclusion that assigning 'unsatisfactory ratings' was an abuse of discretion." *Id.* at 115.

Todd timely appealed to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

### DISCUSSION

We review de novo the Claims Court's determination that it had subject matter jurisdiction, its dismissal of a complaint on the grounds of standing, and its dismissal for failure to state a claim under Rule 12(b)(6). *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010); *Bank of Guam v. United States*, 578 F.3d 1318, 1325 (Fed. Cir. 2009).

### I

We first consider the government's contention that the Claims Court lacked subject matter jurisdiction under the CDA. The Tucker Act provides the Claims Court with jurisdiction over "any claim by or against, or dispute with, a contractor arising under [the CDA], including . . . non-monetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA]." 28 U.S.C. § 1491(a)(2). The CDA, however, does not define such a "claim." We held in *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1564–65 (Fed. Cir. 1995), that the definition of the term "claim" in the FAR governs. The FAR defines "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or

interpretation of contract terms, or *other relief arising under or relating to the contract.*"   48 C.F.R. § 2.101 (emphasis added).  The government does not dispute on appeal that there was a final decision of the contracting officer or a "written demand" seeking relief "as a matter of right."  The sole dispute here is whether Todd's requested relief—in essence a declaratory judgment that the government's performance evaluations were unfair and inaccurate—"relat[es] to the contract."[3]  If so, it is a "claim" under the CDA, and the Claims Court has jurisdiction under the Tucker Act.

Congress' overall purpose to confer comprehensive jurisdiction under the CDA confirms that we should read the definition of "claim" broadly.  We have previously recognized that "[i]n defining the jurisdiction of the [Claims Court] over CDA disputes, Congress has chosen expansive, not restrictive, language."   *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1268 (Fed. Cir. 1999).  The Tucker Act provides jurisdiction to "render judgment upon *any claim* by or against . . . a contractor arising under section 10(a)(1) of the [CDA], including . . . *nonmonetary disputes on which a decision of the contracting officer has been issued* under section 6 of the [CDA]."  28 U.S.C. § 1491(a)(2) (emphases added).  In *Alliant*, the government argued that "nonmonetary disputes" should be read narrowly to exclude "disputes arising prior to the completion of work on a contract" and

---

[3]   The Claims Court held that injunctive relief was not available.  *Todd II*, 88 Fed. Cl. at 243.  Todd did not object to this conclusion on appeal.  Hence, we need not decide whether an injunction was available pursuant to the Claims Court's "power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."  28 U.S.C. 1491(a)(2).

"disputes that have not yet ripened into a monetary dispute but . . . could" if the contractor "could convert the claim into one for monetary relief" by its own actions. 178 F.3d at 1268 (internal quotation marks omitted). We rejected this narrow reading, emphasizing that the provision "begins by broadly granting the court jurisdiction over 'any claims,'" uses the "nonrestrictive term ('including')," and ends the provision with "equally nonrestrictive language" concerning "nonmonetary disputes." *Id.* We also explicitly recognized that "[t]he FAR has . . . ensured that review of contract claims will be relatively easy to obtain, by defining the term 'claim' broadly, to include a demand or assertion seeking . . . relief arising under or relating to the contract." *Id.* at 1271. Therefore, the broad language of the statute and FAR provision supports a broad reading of the term "claim."

The legislative history of the CDA and Tucker Act also supports a broad reading of the term "claim." Both the House and Senate Reports explained that the CDA was intended to "implement[ ] recommendations of the Commission on Government Procurement." S. Rep. No. 95-1118, at 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235; *see also* H.R. Rep. No. 95-1556, at 1 (1978). The Commission on Government Procurement had recommended that Congress "[e]mpower . . . administrative forums to decide all claims or disputes arising under or growing out of or in connection with the administration of [government contracts]." 4 Report of the Commission on Government Procurement 22 (1972). In 1992, when Congress amended the Tucker Act to provide jurisdiction over "nonmonetary disputes on which a decision of the contracting officer has been issued under

section 6 of [the CDA],"[4] the bill's sponsor reiterated the broad scope of disputes covered by the CDA.  He noted that the bill would "amend the Tucker Act to clarify the power of the Court of Federal Claims to hear appeals of *all contracting officers' final decisions*, regardless of whether the dispute involves a claim for money currently due."  138 Cong. Rec. S17799 (daily ed. Oct. 8, 1992) (emphasis added).

Not only is the term "claim" broad in scope, the "relating to" language of the FAR regulation itself is a term of substantial breadth.  The term "related" is typically defined as "associated; connected."  *See* Random House Webster's Unabridged Dictionary 1626 (2d ed. 1998); *see also* Black's Law Dictionary 1288 (6th ed. 1991) (defining "related" as "[s]tanding in relation; connected; allied; akin"); Oxford English Dictionary 1695 (3d ed. 1947) (defining "relation" as "any connection, correspondence, or association, which can be conceived as naturally existing between things").

The Supreme Court has interpreted the term "related to" broadly.  *See, e.g.*, *Celotex Corp. v. Edwards*, 514 U.S. 300, 307–08 (1995) (holding that Congress' jurisdictional grant to bankruptcy courts to hear proceedings "related to" a bankruptcy case "suggests a grant of some breadth" and includes, inter alia, suits between third parties which have an effect on the bankruptcy estate); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992) (holding that preemption provision of Airline Deregulation Act— preempting laws "relating to rates, routes, or services" of any air carrier—should be broadly construed); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983) (holding that state law "relates to" an employee benefit plan and is

---

[4]    *See* Federal Courts Administration Act, Pub. L. No. 102-572 § 907 (Oct. 29, 1992).

therefore preempted by ERISA "if it has a connection with, or reference to, such a plan"). Similarly, in *Tyco HealthCare Group LP v. Ethicon Endo-Surgery*, 587 F.3d 1375, 1378 (Fed. Cir. 2009), we recognized that "[i]n general, 'related to' means one thing has some . . . connection to another thing," and "[i]n legal parlance," the term has "similar breadth." We therefore interpreted the contractual phrase "related to pending litigation" broadly. *Id.* at 1379.

In line with this authority, we have previously held that to be a claim "relating to the contract" under the CDA, the claim "must have some relationship to the terms or performance of a government contract." *Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed. Cir. 1998).[5] The performance evaluations at issue have a direct connection and association with Todd's government contracts and, under this "ordinarily broad understanding of the phrase," *Tyco*, 587 F.3d at 1379, appear to be "relat[ed] to the contract." While the unsatisfactory performance evaluations may not relate to the terms of the contract itself, they relate to Todd's performance under the contract. As the Claims Court recognized:

---

[5]    In *Applied*, the government made two overpayments to the contractor because of a computer error. 144 F.3d at 1473. The government decided to discharge the contractor's debt on these overpayments "by setting it off against the amount the government had agreed to pay [the contractor] pursuant to" a settlement agreement on another contract. *Id.* at 1472. Applied argued that the government's attempt to recoup the overpayments in this fashion was a "claim" under the CDA and that CDA procedures should apply. *Id.* at 1477. However, we rejected this argument because the overpayments had no relationship to the parties' performance under the contract, as the overpayments were not due under a contract and were not for work performed under a contract. *Id.* at 1478.

> The subject of the evaluations is the quality of the contractor's performance under the terms of the contract . . . . As a matter of logic, a performance evaluation relates to the contractor's performance under the contract, in the same way that any evaluation relates to the thing evaluated.

*BLR Grp. of Am., Inc. v. United States*, 94 Fed. Cl. 354, 373 (2010) (quoting *Todd I*, 85 Fed. Cl. at 44–45).

The government does not contend that the contracting officer's decision regarding the negative performance evaluations bore no relationship to Todd's performance under the contract. Rather, relying on *Paragon Energy Corp. v. United States*, 645 F.2d 966 (Ct. Cl. 1981), the government argues that Todd's claim cannot "relat[e] to the contract" unless it is based on a "valid contractual theory," (e.g., breach of contract or mistake). *Paragon* imposes no such limitation. While as a general matter *Paragon* found that the CDA statute "should not be interpreted quite so broadly as its language at first blush would suggest," it recognized that the "language is obviously quite broad." *Id.* at 971. It found that a narrower interpretation was required only in one respect––the term "claim" should not be interpreted to include a challenge that the legislative history showed Congress intended to exclude. *Id.* at 973–75.

Specifically, the Court of Claims held that a challenge to the government's denial of a request for contract modification under Public Law 85-804 was not a "claim" under the CDA. *Id.* at 972. Public Law 85-804 gave government agencies the discretionary authority to modify contracts if the modifications would facilitate the national defense. *Id.* at 968. Congress was concerned that a bill which granted CDA jurisdiction over Public Law 85-804 challenges would allow "agencies to settle

claims independent of their legal or contractual merits," i.e. "horse trade settlements", which could only be done "through resort to Public Law 85-804 with its [attendant] safeguards including congressional review." *Paragon*, 645 F.2d at 973 (quoting S. Rep. No. 95–1118, at 5). Therefore, Congress passed a final version of the bill that "address[ed] the concerns expressed by [several Senate committees] that the Act not permit the Contracting Officer or the Agency Boards to grant the discretionary relief . . . authorized by Public Law 85-804." *Id.* at 974 (quoting 124 Cong. Rec. 18639–41 (daily ed. Oct. 12, 1978)).

In *Paragon*, while holding that the Public Law 85-804 claim was not within the scope of the CDA, the court also held that the CDA did confer jurisdiction over the contractor's claim for a contract reformation. *Id.* at 972, 975. The court concluded that "Congress could not have expressed itself more clearly to the effect that all contractor claims based upon a valid contractual theory fall within [its] jurisdiction under the [CDA]." *Id.* at 975. Contrary to the government's contention, *Paragon* merely confirms that all claims which *are* based on a valid contractual theory provide the Claims Court with CDA jurisdiction. *Paragon* does not require a claim to be based on "valid contractual theory" in order to "relat[e] to a contract." As we made clear in *Applied Companies*, CDA jurisdiction exists when the claim has "some relationship to the terms *or performance* of a government contract." 144 F.3d at 1478 (emphasis added).[6] A contractor's claim need not be

---

[6]    The government suggests that this approach improperly reads the performance evaluation regulation into the contract under *G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963), and its progeny. In holding that the Claims Court has jurisdiction under the CDA, we do not suggest that the performance evaluation

based on the contract itself (or a regulation that can be read into the contract) as long as it relates to its performance under the contract.[7]

Lastly, the government asserts that even if performance evaluations "relat[e] to the contract" under the CDA, the performance evaluation regulations cannot provide Todd with a cause of action because they "[exist] primarily for the benefit of the [g]overnment." Appellee's Br. 42. The government relies on our decisions in *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000), *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997), and *Rough Diamond Co. v. United States*, 351 F.2d 636, 640–42 (Ct. Cl. 1965), in which we held that particular plaintiffs could not sue under a statute or regulation if the law was not intended to benefit that class of plaintiffs. *See also United States v. N.Y. & Porto Rico S.S. Co.*, 239 U.S. 88 (1915). Those

---

regulation should be read into the contracts. Rather, the regulation applies of its own force and directly governs the parties' performance under the contracts. Our decisions in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010), and *Agredano v. United States*, 595 F.3d 1278 (Fed. Cir. 2010), are inapplicable here. In those cases, the regulations were not designed to benefit the contractor and there was no claim that the regulations themselves created rights enforceable by the contractors apart from the contracts.

[7]    The government analogizes a performance evaluation challenge to a debarment challenge, which we have held in a non-precedential opinion does not provide the Claims Court with CDA jurisdiction. *See Schickler v. Davis*, 10 Fed. Appx. 944 (Fed. Cir. 2001). The CDA only applies if there is "a decision of the contracting officer." 28 U.S.C. § 1491(a)(2). Unlike a performance evaluation, the determination to debar a contractor, is made by an agency's so-called "debarring official," rather than the contracting officer. *See* 48 C.F.R. § 9.406.

cases established that a law or regulation must "protect or benefit a class of persons in order for that class to be able to bring suit against the government" and that the class must be more than an "incidental beneficiary" of the regulation. *Cessna Aircraft*, 126 F.3d at 1451–52. However, it is possible for a regulation or law to benefit both the government and a class of private parties. *See Rough Diamond*, 351 F.3d at 640. That is the case with performance evaluations.

48 C.F.R. § 42.1502 is the current regulation providing for mandatory performance evaluations under certain government contracts, including construction contracts. Subpart 42.15 of the FAR was added in 1995 to "implement[ ] Office of Federal Procurement Policy Letter 92–5." 48 C.F.R. § 42.1500 (1996). In that letter, the Office of Federal Procurement Policy explained that "policies and procedures for collecting, recording, and using past performance information [which many agencies have already established] . . . are *extremely important to both the Government and to contractors*, and requirements are necessary to help ensure their integrity and fairness." *Past Performance Information*, 58 Fed. Reg. 3,573-02, 3,575 (Jan. 11, 1993) (emphasis added). As this history demonstrates, even the government viewed fair and accurate performance evaluations as providing substantial benefits to contractors. This is not a situation in which the contractors are merely "incidental benefi[ciaries]" of the regulations. *Cessna Aircraft*, 126 F.3d at 1452. Performance evaluation regulations were intended to directly and significantly benefit contractors.

## II

The government argues that we should nonetheless dismiss Todd's complaint for lack of standing (with

respect to its procedural allegations) and failure to state a claim (with respect to its substantive allegations).

As explained above, Todd alleged that the government failed to follow four procedural requirements listed in ER 415-1-7. These were notifying Todd of the performance elements that would be used to evaluate it; holding a conference with Todd before issuing an interim unsatisfactory performance rating; re-evaluating the interim unsatisfactory rating every three months; and issuing of a final evaluation within sixty days after project completion. In general, standing requires that the plaintiff show an injury in fact, "a casual connection between the injury and the conduct complained of," and that his injury would likely be redressable by court action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). However, the Supreme Court has also explained that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* at 573 n.7. Some courts of appeals have accordingly relaxed the causation requirement when determining standing for procedural injuries, finding it satisfied when following the correct procedures plausibly *may* have changed the result. *See, e.g.*, *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011); *Friends of Tims Ford v. TVA*, 585 F.3d 955, 968 (6th Cir. 2009); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 44–49 (1989).

These relaxed standards have been applied, however, in cases involving fundamental procedural rights, such as the right to a hearing, *see Lujan*, 504 U.S. at 572, 573 n.7, the right to an environmental impact statement, *Ctr. for Food Safety*, 636 F.3d at 1172, and the right to have a decisionmaker free from ex parte contacts in formal administrative hearings, *Elec. Power Supply Ass'n v.*

*FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004).[8]  No case has been called to our attention that has applied these relaxed standards to minor procedural violations of the type involved in this case.  For example, in *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1377–78 (Fed. Cir. 2009), a bid protestor challenged an agency's contract award to another bidder on the ground that the agency failed to follow the proper procurement procedures by accepting proposal revisions from other bidders via e-mail when revisions were required to be sent by mail or facsimile.  We held that in these circumstances the plaintiff had no standing because it could not "show that it was prejudiced by a significant error" (i.e., "that but for the error, it would have had a substantial chance of securing the contract").  *Id.* at 1378, 1380.  The alleged procedural violations here do not fall into the category of fundamental procedural rights.  Hence, we conclude that Todd is required to show prejudice.

In fact, Todd has alleged nothing to indicate that the outcome of the performance evaluations would have been any different if the purported procedural errors had not occurred.  Todd did not allege that government compliance with its procedural standards would have changed its actions.  Although Todd alleged it was not provided "an opportunity to cure any perceived deficiencies in its performance," J.A. 109, Todd did not allege that if the required procedures had been followed, it would have taken curative action or that the performance evaluation

---

[8]     *See also* Richard J. Pierce, Jr., *Making Sense of Procedural Injury*, 62 Admin. L. Rev. 1, Winter 2010 ("Each of the contexts in which courts have applied [the relaxed standard] . . . involved deprivation of a fundamental procedural right.  Each of the procedural rights at issue was either . . . constitutionally required or the subject of a statute in which Congress required the agency to provide the procedure.")

would have been different. Therefore, Todd lacks standing to sue with respect to the procedural violations.

Todd clearly does have standing to sue based on its substantive allegation that the government acted arbitrarily and capriciously in assigning an inaccurate and unfair performance evaluation. However, the government contends that Todd failed to state a claim entitling it to relief. We must dismiss a complaint for failure to state a claim where the complaint does not "state a claim to relief that is plausible on its face," i.e., where the plaintiff fails to "plead[ ] factual content that allows [a] court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Here, Todd must plead facts which give rise to a plausible inference that the government abused its discretion in awarding the negative performance ratings.

The government argues that Todd failed to meet this burden because it failed to "allege that the performance evaluations at issue . . . were based solely—or even substantially—upon the specific performance difficulties" that Todd claimed were not its fault. Appellee's Br. 56–57. Comparing the factual allegations in the complaint with the performance evaluations, we conclude that the government is correct. All of the facts alleged by Todd could be true and yet it does not follow that any of the unsatisfactory ratings were an abuse of discretion or should be changed.

Todd's complaint raised issues related to the timeliness of its performance (e.g., "adequacy of initial progress schedule," "adherence to approved schedule," "submission of required documentation," and "resolution of delays"). J.A. 114. In this respect, Todd merely alleged that the "delays . . . were caused by unforeseen events, *many of*

*which* were neither the fault nor the responsibility of Todd." *Id.* at 113 (emphasis added). Although Todd alleged that numerous specific delays were not Todd's responsibility, those allegations cannot change the fact that Todd admits in its appeal brief that some delays were not the government's fault but were instead caused by Todd's subcontractors. We have previously explained that "a contractor is responsible for the unexcused performance failures of its subcontractors." *See, e.g., Johnson Mgm't Grp. CFC Inc. v. Martinez*, 308 F.3d 1245, 1252 (Fed. Cir. 2002). Todd has failed to allege facts that would excuse its subcontractors' delays. Todd's bare assertion that it is not responsible for the actions of its subcontractors is a legal conclusion, and we are not required to assume that legal conclusions are true. *See Iqbal*, 129 S.Ct. at 1949–50. Todd also specifically admitted in the complaint that it delivered only "the majority [i.e., not all] of the [required] submittals" to the government on time. J.A. 107, 110. The performance evaluations do not specify how much delay the government attributed to Todd; they simply indicate that Todd's performance was untimely. To raise a plausible inference that the ratings were arbitrary and capricious, the contractor would, at the very least, need to allege facts indicating that all of the substantial delays were excusable.[9] Todd has not done so, and we therefore agree with the Claims Court that its complaint was properly dismissed under Rule 12(b)(6).

---

[9]    Apart from Todd's allegations on delay, Todd also specifically asserts that its problems with subcontractors did not reflect poorly on its management or supervisory capabilities. Again, Todd's conclusory statement that the performance of its subcontractors could not reflect negatively on its own performance does not support a claim that its performance ratings for effectiveness of management and control of subcontractors should be changed.

## AFFIRMED

COSTS

No costs.