DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - ) | |
| ) | |
| Michael M. Tsontos, S.A. Chania ) | ASBCA No. 63595 |
|    Sucursala Bucuresti ) | |
| ) | |
| Under Contract No. W912GB-17-D-0015 ) | |

APPEARANCE FOR THE APPELLANT:      Paul D. Reinsdorf, Esq.
          Theodor-Heuss-Allee 112
          Frankfurt, Germany

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
          Engineer Chief Trial Attorney
          David B. Jerger, Esq.
          Engineer Trail Attorney
          Baltimore., MD

          Jason Shippy, Esq.
          Engineer Trial Attorney
          Brooklyn, NY

          Herbert J. Aldridge, Esq.
          Engineer Trial Attorney
          U.S. Army Engineer District, Europe

OPINION BY ADMINISTRATIVE JUDGE TAYLOR
ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

In this appeal, Michael M. Tsontos SA Chania Sucursala Bucuresti (Tsontos Romania) moves for summary judgment contending the United States Army Corps of Engineers (USACE or the government) failed to satisfy the Contractor Performance Assessment Reports (CPARS) "fair and equal" requirement when it violated Federal Acquisition Regulation (FAR) 42.1502(a) by issuing CPARS to Michael M. Tsontos, S.A. (Tsontos Greece) instead of Tsontos Romania, the "entity, division or unit" that performed the task orders (app. mot. at 23-24). The government responds appellant's motion should be denied since genuine issues of material fact exist as to whether the contracting officer's determination that Tsontos Greece and Tsontos Romania were the same entity that performed the contract was reasonable (gov't opp'n at 1). The government also contends that appellant has not shown USACE erred in issuing the CPARS to Tsontos Greece based upon the contracting officer's conclusion

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

that Tsontos Greece and not Tsontos Romania was the entity that performed the work (*id*.).

As discussed below, we grant appellant's summary judgment motion since the undisputed facts show Tsontos Romania was the "entity, division or unit" of Tsontos Greece that performed the contract work. Furthermore, we determine the government failed to follow FAR 42.1502(a) in issuing the CPARS to Tsontos Greece rather than Tsontos Romania - the "entity, division or unit" that performed the task orders.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

In support of its motion, appellant filed a statement of undisputed material facts (ASUMF). The government responded to appellant's statement of undisputed material facts and provided additional material facts (GSUMF). In its reply brief, appellant responded to the government's additional proposed material facts (app. reply at 4-15). The following facts are undisputed or uncontroverted.

Contract Award and Modifications

1. On September 26, 2017, the USACE awarded the base Contract No. W912GB17D0015 (the contract), a multiple award task order contract (MATOC) to Tsontos Greece for construction services in Romania (R4, tab 3). The contract lists the address for Tsontos Greece as "1 Efedron Polemiston, Chania 73135" with a North Atlantic Treaty Organization Commercial and Government Entity Code (NCAGE Code) of "G1851" (*id*. at 11).[1] The contract indicated the contractor's performance would be evaluated upon completion of each task order in accordance with FAR 42.1502 (*id*. at 168).

2. The government subsequently awarded four task orders to Tsontos Greece under the contract for various construction projects in Romania (the task orders) (R4, tabs 42-43, 60, 69, 89). Task Order No. W912GB17F0276 provided for the design and construction of a cargo parking apron at Mihail Kogalniceanu (MK) Air Base near Constanta, Romania (R4, tab 69). Task Order No. W912GB18F0020 involved the construction of a squadron operations facility, parking apron and aircraft hangar

---

[1] A Commercial and Government Entity (CAGE) Code is a five-character alpha-numeric identifier assigned by the Defense Logistics Agency as a standardized means of identifying legal entities located in the United States and its territories. For entities located outside of the United States and its territories, a NCAGE code is assigned. The terms CAGE code and NCAGE code appear to be used interchangeably. *See MTS General Trading & Construction*, ASBCA No. 63521, 24-1 BCA ¶ 38,501 at 187,137 n.2.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

at Campia Turzii Air Base in Romania (R4, tabs 42, 43).  Task Order
No. W912GB18F0021 was for the construction of a munitions storage area at Campia
Turzii Air Base (R4, tab 60).  Task Order No. W912GB18F0404 involved the design and
construction of a substation and switching building at the MK Air Base (R4, tab 89).

3.  On November 3, 2017, Tsontos Greece's Board of Directors (the Board)
decided to establish a branch in Romania identified as Tsontos Romania (GSUMF ¶ 74).
The Board appointed Mr. Michael M. Tsontos, the Tsontos Greece chairman, as the
branch administrator (*id*.).  Tsontos Greece established the branch in Romania to qualify
for the value added tax (VAT) exemption and perform the task orders in Romania
(ASUMF ¶¶ 3, 5).  On December 20, 2017, the Romanian Ministry of Justice issued
a certificate of registration to Tsontos Romania identifying that entity as a branch of
a foreign firm (ASUMF ¶ 30, GSUMF ¶ 75, R4, tabs 8-9).  The certificate contained
a unique Registration Code and a Unique European Identity number (ASUMF ¶ 30).
Tsontos Greece did not establish Tsontos Romania as a separate legal company (gov't
opp'n at 2; exs. G-2-3).  On February 22, 2018, the Romanian authorities also issued a
value added tax exemption certificate to Tsontos Romania (ASUMF ¶ 32, app. supp. R4,
tab 27).[2]

4.  In a letter dated May 22, 2018, Mr. Tsontos requested the USACE
contracting officer change the name on the contract from "Michael M. Tsontos S.A." to
"Michael M. Tsontos SA Chania Sucursala Bucuresti" (R4, tab 11 at 248).  Mr. Tsontos
indicated Tsontos Greece would be the parent to Tsontos Romania "the branch
company established in Romania for the purposes of this contract" (*id*.).  Mr. Tsontos
further indicated Tsontos Greece had established Tsontos Romania as a branch
company under Romanian law to be exempt from Romanian taxes (*id*.).  Mr. Tsontos
provided the contracting officer with various branch identification information and
indicated "[T]he 'Branch' is equal in resources and procedures, has full signature
authority for MICHAEL M. TSONTOS S.A. and speaks as/for the Chairman,
Mr. Michael Tsontos, himself" (*id*.).

5.  On August 22, 2018, the government and Mr. Tsontos signed bilateral
contract Modification No. P00001 (R4, tab 15).  The modification's stated purpose
was to "Exercise Option Year 1 and correct the name of the awardee" (*id*. at 255).
The "Summary of Changes" indicated the contractor organization had changed from:

---

[2] The value added tax exemption appears to have been released on February 22, 2018,
and not February 28, 2018, as indicated in ASUMF ¶ 32.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> TSONTOS, MICHAEL M., S.A.
> 1 EFEDRON POLEMISTON
> CHANIA 73135
> to
> MICHAEL M. TSONTOS SA CHANIA SUCURSALA B
> STR. GHEORGHE MOCEANU NO. 6 ROOM 6
> BUCHAREST

*Id*. at 256. The modification, however, did not change the CAGE code.

6. By email dated November 27, 2018, Mr. Steven Ashton, the Tsontos Romania task order program manager, requested the government change the awarded task orders to list Tsontos Romania as the contractor (ASUMF ¶ 5). Mr. Ashton indicated the contract documents needed to note the Tsontos Romania name and address in order to get the value added tax exemption (*id*.). Mr. David Neal, the USACE Team Contracting Chief, responded that the government was unable to issue a modification changing the name and address on the task orders unless the separate branch was registered in the System for Award Management (SAM) database (app. supp. R4, tab 13 at 3).[3] Tsontos Romania applied for and received a separate NCAGE code from the NATO Support and Procurement Agency in Luxembourg (ASUMF ¶ 33). On January 21, 2019, Tsontos Romania completed the SAM registration for the Tsontos Romania branch company (ASUMF ¶ 34; app. supp. R4, tab 13 at 1). The SAM entry for Tsontos Romania included in the "Entity Information" the Romanian address and a CAGE code of "1H3VL" (app. supp. R4, tab 8 at 2). The government subsequently issued modifications on the task orders changing the contractor information to Tsontos Romania (ASUMF ¶ 8; R4, tabs 53, 66, 73, 96).

7. On March 11, 2019, the government issued unilateral contract Modification No. P00002 (R4, tab 21). The modification's stated purpose was "to correct the contractor's name and CAGE to finalize the name change agreement completed as part of P00001" (*id*. at 288). The "Summary of Changes" again indicated the contractor organization had changed from Tsontos Greece to Tsontos Romania (*id*. at 289). The modification also replaced the CAGE code on the contract with "1H3VL", the CAGE code assigned to Tsontos Romania (*id*. at 288). The government issued all subsequent modifications under the contract to Tsontos Romania using that entity's CAGE code (R4, tabs 27, 35; ASUMF ¶ 7).

---

[3] The System for Award Management (SAM) is a United States General Services Administration system that tracks consolidated data relating to government procurements. *See USAC Aerospace Group Inc. dba USAC Aerospace Group; Ordnance Division,* ASBCA No. 59186, 17-1 BCA ¶ 36,695 at 178,655.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

8. The USACE uses the Resident Management System (RMS) as its primary software to administer contracts (ASUMF ¶ 39). Every prime contractor is registered in RMS and assigned a unique number (ASUMF ¶ 40). The USACE set up two Tsontos accounts in RMS (*id.*). The government changed the RMS entry for the task orders to Tsontos Romania (*id.*).

Contract Performance

9. The Tsontos Romania organization structure and staffing chart indicates most of that organization's key employees were physically located in Romania (app. supp. R4, tab 19). These key employees performed the task orders while deployed almost exclusively in Romania (app. supp. R4, tab 39 ¶¶ 20-24). The organization structure and staffing chart also shows that Mr. Tsontos, the Tsontos Greece President & CEO, to whom the Romanian program and project managers reported, was in Greece (app. supp. R4, tab 19). The Tsontos Romania organizational chart indicates Mr. Tsontos had ultimate control over Tsontos Romania (app. supp. R4, tab 18).

10. Mr. Ashton, the managing member of Ashton Consulting, became the Tsontos Romania task order program manager in early 2018 (app. supp. R4, tab 39 at 2). Mr. Ashton formalized his contractual relationship with Tsontos Romania on June 4, 2019 (*id.* at 3). Many of the key employees working in Romania performed under labor contracts executed by Mr. Tsontos in his capacity as the Tsontos Romania administrator (*see e.g.,* app. supp. R4, tabs 21, 37-39).

11. Tsontos Romania performed many key administrative functions such as bookkeeping, banking transactions and fiscal filings with Romanian authorities in Romania (app. supp. R4, tab 39 ¶¶ 17-18; exs. G-7-8). Following the execution of Modification No. P00002, the government also made all payments under the contract to Tsontos Romania (ASUMF ¶ 27).

12. Tsontos Romania included a 15% markup in its billings under the task orders for home office overhead support provided by Tsontos Greece personnel located in Greece (exs. G-7-8). The home office support costs included company top management support, travel expenses for top management and consultants, company home office accounting and finance support, company home office HR support, company head office administrative and logistics support, general and specific staff training requirements, incidental engineering and technical support services and home office miscellaneous general and administrative support costs (*id.*).

13. Tsontos Romania entered numerous subcontracts for the work required under the task orders (*see e.g.*, app. supp. R4, tabs 22-23, 51-52; app. supp. R4, tab 39 ¶¶ 21-25). Mr. Tsontos signed these subcontracts on behalf of Tsontos Romania (*see e.g.*, app. supp. R4, tabs 22-23, 51-52). Tsontos Greece entered one subcontract to obtain the designer of

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

record on the MK Cargo Apron Task Order a month before establishing Tsontos Romania (app. supp. R4, tab 36 at 1). That subcontract provided the contract would be transferred from the "Mother" company to the "new Branch" the moment Tsontos Romania was established (*id*.).

Contract Performance Assessment Reports

14. CPARS are intended to capture a contractor's performance information on a contract or task order for future source selection purposes. *See* FAR 42.1501(a) General. The government issued several CPARS on the task orders (app. supp. R4, tabs 14-17); (R4, tabs 68, 85, 98). All the issued CPARS listed "Michael M. Tsontos, S.A." as the vendor and left the entry for the division name blank (*id*.). The CPARS pulled their information for the contractor from the SAM identification number (GSUMF ¶ 56; app. supp. R4, tab 3 at 2).

15. On April 17, 2020, the government requested Tsontos Greece provide its comments in response to the interim CPARS issued on the Campia Turzii task orders for the apron hanger and munitions storage area (app. supp. R4, tab 3 at 3). Mr. Ashton provided the close-out comments to the government (*id*. at 2-3). In his comments, Mr. Ashton requested the government update the CPARS with the correct company information since the government issued the CPARS to Tsontos Greece and not the branch company Tsontos Romania (*id*. at 2). Mr. Ashton further indicated the CPARS information for the MK cargo apron and power substation task orders likewise needed to be updated (*id*. at 3). The USACE responded that the only company under the name "Tsontos" in SAM was "Tsontos Greece" (*id*. at 2). Subsequently, the government acknowledged that "Tsontos Romania" was in the system but required typing the full name "Michael M. Tsontos" rather than just "Tsontos" to get that SAM information (*id*. at 1).

16. On May 11, 2021, Mr. Ashton again contacted the USACE requesting correction of the CPARS company information to "Tsontos Romania" (app. supp. R4, tab 4). Mr. Ashton included a screenshot of the SAM Registration for the "Tsontos Romania" branch company (*id*.). On May 17, 2021, Mr. Mike Marish, a USACE Office Engineer, informed Mr. Ashton that "there was an error in our system when they setup the administrative modification to change the new DUNS and Cage Code" following the issuance of the contract modification (app. supp. R4, tab 7 at 1). The USACE further indicated that they would work on fixing the administrative error so that "future evaluations will be correct" (*id*.).

17. On June 21, 2022, Mr. Ashton again raised the issue of the incorrect CPARS (app. supp. R4, tab 9 at 4-5). Mr. Christopher Ainsworth, a procurement analyst with the USACE, indicated the problem was that the "CAR was never updated and remains as the parent company's SAM identity. CAR data feeds into FPDS-NG, which feeds into

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

CPARS, so that is why the cage code was never changed in CPARS" (*id*. at 1). A Contract Action Report (CAR) should contain the basic contract information such as contract number and price (ASUMF ¶ 43). A CAR should also contain the contractor's CAGE code (ASUMF ¶ 46). The CAR feeds into the Federal Procurement Data System (FPDS) and the FPDS in turn feeds into the CPARS (ASUMF ¶ 47). Apparently, the CAR on the contract was not changed to the Tsontos Romania CAGE code number following the issuance of Modification No. P00002 due to a possible oversight (ASUMF ¶ 46). Mr. Ainsworth further stated, "from a contracting perspective, the evaluations of the branch company can be used to evaluate the past performance of the parent company" (app. supp. R4, tab 9 at 1). The USACE Contracting Division Branch Chief recognized Mr. Ainsworth as "our CPARS guru" (*id*. at 2). The government did not change the name on the CPARS (app. supp. R4, tab 10).

18. FAR Subpart 42.15 provides the policies and establishes the responsibilities for recording and maintaining contractor performance information. FAR 42.15, CONTRACTOR PERFORMANCE INFORMATION (SEP 2013). FAR 42.1502(a) indicates past performance evaluations "are generally for the entity, division, or unit that performed the contract or order." FAR 42.1502(a), POLICY (MAY 2014).

19. The USACE's December 2023 "Guidance for the Contractor Performance Assessment Reporting System (CPARS)" provides under the "Instruction for Completing Evaluations" section that:

> A3.1 Name/Address of Contractor. State the name and address of the division or subsidiary of the contractor that is performing the contract/order. Identify the parent corporation (no address required). Identify the Unique Entity ID, Product/Service Code, and Principal NAICS Code. All codes can be accessed by using the on-screen "lookup" function provided.

GSUMF ¶ 61.

Certified Claim and Final Decision

20. On July 18, 2022, Mr. Tsontos filed a certified claim with the USACE on the contract asserting the issued CPARS were not "fair and accurate" because they identify the wrong entity that performed the work and were inconsistent with FAR 42.1502 since the CPARS were not issued to "the entity, division, or unit that

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

performed the contract or order" (R4, tab 58 at 418-19). Mr. Tsontos signed the claim as "President" (*id*. at 419).[4]

21. On January 31, 2023, the USACE issued a contracting officer's final decision (COFD) denying the claim (R4, tab 2). The COFD determined the CPARS were "'fair and accurate' in identifying Michael M. Tsontos, S.A. as the entity who performed the work" since Tsontos Greek and Tsontos Romania were the same entity (R4, tab 2 at 2). Moreover, the COFD determined the CPARS were consistent with FAR Part 42.1502 since Tsontos Romania was not "independently populated in a manner that allowed it to perform work as a separate division or unit" (*id*.).

DECISION

I. Summary Judgment Standard

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003); FED. R. CIV. P. 56(a). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)).

While the movant must demonstrate there is no "genuine issue for trial," the nonmovant must "make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts, "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby, Inc*. 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v.* Cities Serv. Co., 391 U.S. 253, 288 (1968). "[M]ere denials or conclusory statements are insufficient." *SRI Int'l v. Matushita Elec. Corp. of Am*., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd*., 731 F.2d 831, 836 (Fed. Cir. 1984).

---

[4] Mr. Tsontos submitted the claim on Tsontos Romania letter head indicating Tsontos Romania was the "contractor" or "Romanian Entity" submitting the claim (R4, tab 58 at 1). The government has not raised the issue of whether Tsontos Romania, a branch of Tsontos Greece, had the legal capacity to file a claim with the government. We find, however, that Mr. Tsontos submitted this claim on behalf of Tsontos Greece, the contractor, since he signed and certified the claim as the "President" and not as the branch administrator.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

II.  Tsontos Romania Is a Separate Branch, Not A Separate Legal Entity

In its opposition to appellant's motion for summary judgment, the government first contends that the contracting officer's issuance of the CPARS to Tsontos Greece was reasonable since Tsontos Greece and Tsontos Romania were the same legal entity (gov't opp'n at 1).  Appellant, however, is not asserting Tsontos Romania is a separate legal entity apart from Tsontos Greece (app. mot. at 16).  Rather, appellant contends Tsontos Romania was a "separate branch" of Tsontos Greece that performed the task orders in Romania (*id.*).

The Romanian Ministry of Justice issued a certificate of registration to Tsontos Romania establishing it as a branch of Tsontos Greece in Romania (SOF ¶ 3).  The Ministry of Justice did not establish Tsontos Romania as a separate legal company or separate legal entity (*id.*).  Rather, Tsontos Greece established Tsontos Romania as an extension of itself, the parent company, to operate in Romania as a branch and not as a separate subsidiary company.  Black's Law Dictionary defines a "branch" as "1. [A]n offshoot, lateral extension, or division of an institution" (Black's Law Dictionary 182 (7th ed., 1999).  Thus, a branch is comparable to or the equivalent of a division.

Government contractors frequently establish divisions or business units, that are not separate legal entities, to conduct business in specific product lines or locations. For example, the Boeing Company conducts its business through a corporate headquarters and numerous operating divisions.  *See e.g., The Boeing Company*, ASBCA No. 19224, 77-1 BCA ¶ 12,371 at 59871-74 (discussing how Boeing conducts its business through various business units or divisions).[5]  Tsontos Greece's establishment of a division or unit to conduct its business in Romania is no different.

III.  Government's Issuance of the CPARS to Tsontos Greece Rather Than Tsontos Romania Did Not Follow FAR 42.1502(a)

Appellant contends the government's issuance of the CPARS to Tsontos Greece rather than Tsontos Romania was not "fair and accurate" since it violated FAR 42.1502(a) (app. mot. at 28-30).  We previously have remanded CPARS back to the agency when we have found the contracting officer failed to follow the applicable regulations.  *See PROTEC GmbH*, ASBCA Nos. 61161, 61162, 61185, 18-1 BCA ¶ 37,064 at 180,420; *ServeFed, Inc.*, ASBCA No. 63290, 23-1 BCA ¶ 38,282 at 185,877 (the Board possesses jurisdiction over an amended complaint seeking the

---

[5] Of course, Boeing's business units have undergone numerous revisions since this decision was issued but the basic structure of one corporate headquarters with operational business units remains the same.  *See* BOEING, https://www.boeing.com/company/key-orgs/boeing-global (last visited Oct. 9, 2024).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

remand of a CPARS rating to the contracting officer to determine whether the rating should be amended to comply with the applicable regulations); *See also Todd Constr. L.P. v. United States*, 656 F.3d 1306, 1316 (Fed. Cir. 2011) (Board may determine whether "the government acted arbitrarily and capriciously in assigning an inaccurate and unfair performance evaluation").

Here, the contract indicated the contractor's performance would be evaluated in accordance with FAR 42.1502 (SOF ¶ 1). FAR 42.1502(a) provides performance evaluations are "generally for the entity, division, or unit that performed the contract or order." FAR 42.1502(a). As discussed below, we determine the undisputed facts show Tsontos Romania was the "entity, division or unit" that performed the task orders within the meaning of FAR 42.1502(a).

A. Tsontos Romania Was A Separate Branch

The government first contends appellant's summary judgment motion should be denied because appellant has not established Tsontos Romania had a "separate personality" (gov't opp'n at 13-15). Tsontos Romania's status as a separate branch operating on behalf of Tsontos Greece in Romania to perform the task orders is clearly established by both the undisputed actions of the Romanian authorities and the government. The Romanian Ministry of Justice issued a certificate of registration to Tsontos Romania identifying it as a branch of a foreign firm (SOF ¶ 3). The certificate included a unique Registration Code and a Unique European Identity number (*id*.). The Romanian authorities also issued a value added tax exemption certificate to Tsontos Romania (*id*.).

Moreover, the government recognized Tsontos Romania as the division performing the task orders on behalf of Tsontos Greece in Romania. The government first issued a modification changing the contractor's name and address on the contract from Tsontos Greece to Tsontos Romania (SOF ¶ 5). Following Tsontos Romania's receipt of its own NCAGE code and registration in the SAM database, the government issued modifications changing the contractor information on the task orders to Tsontos Romania (SOF ¶ 6). The government then issued a modification changing the CAGE code on the contract to reflect the change in the contractor organization performing the contract (SOF ¶ 7). The government also set up a separate entry and unique number in its RMS for Tsontos Romania and indicated Tsontos Romania was the contractor performing the task orders (SOF ¶ 8). Finally, the government made all the payments under the contract to Tsontos Romania following the execution of Mod P00002 (SOF ¶ 11).

In its opposition to appellant's motion, the government contends the Board should deny the motion because disputed issues of genuine material fact exist concerning whether Tsontos Romania was a separate "entity" apart from Tsontos Greece that performed the contract (gov't opp'n at 15-22). The government first

10

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

asserts a disputed fact exists as to whether Tsontos Romania was "exclusively performing" the contract since Mr. Tsontos headed both Tsontos Greece and Tsontos Romania (gov't opp'n at 16). Appellant responds that it does not contend Tsontos Romania "exclusively" performed the contract (app. reply at 20). Rather, appellant notes Mr. Tsontos' position as the Tsontos Greece chairman did not preclude him from also acting as the administrator of Tsontos Romania in taking official actions on behalf of the branch (*id.* at 21). Appellant is correct. The record shows Mr. Tsontos used the Tsontos Romania name and address and signed on behalf of Tsontos Romania when he acted as the Tsontos Romania administrator in executing the Tsontos Romania labor and subcontracts (SOF ¶¶ 12-13). The fact that he was also the Tsontos Greece chairman does not undermine those actions.

The government next suggests Mr. Tsontos' statement in his May 22, 2018, letter (requesting the contracting officer change the name on the contract) that the branch had "full signatory authority" for Tsontos Greece and speaks for the chairman indicates Tsontos Romania is not a separate organization (gov't opp'n at 16). Appellant correctly notes that this statement simply confirms the branch is legally part of the parent and not a separate legal entity (app. reply at 21). Moreover, the government ignores the remaining parts of this letter where Mr. Tsontos clearly indicates Tsontos Greece will be the parent to Tsontos Romania and that Tsontos Romania is being established as a branch company "for the purposes of this contract" (SOF ¶ 4). Mr. Tsontos' statement does not create a material disputed fact.

Third, the government contends the lack of any agreements or memorandum between Tsontos Greece and Tsontos Romania transferring contract performance or arranging for a change in management indicates Tsontos Greece treated Tsontos Romania as indistinguishable and not as a separate entity (gov't opp'n at 16). Appellant responds no such agreements or memorandum were necessary since the branch was legally a part of the parent (app. reply at 21). We agree that the lack of any such agreements or memorandum does not create a material disputed fact as to whether Tsontos Romania was a separate branch.

Fourth, the government contends Tsontos Romania's continued use of the Greek domain of tsontos.gr and email signature blocks including the name of Tsontos Greek indicates Tsontos Romania did not distinguish itself from Tsontos Greece (gov't opp'n at 16-17). Appellant does not dispute these facts (app. reply at 22). Rather, appellant states the use of the same server for assigning employees of the branch email accounts is common within large organizations (app. reply at 11). We agree appellant's use of the same server assigning email accounts for both the parent and branch and the use of the name Tsontos Greek in the signature block are not indicia that Tsontos Romania was not a separate branch within Tsontos Greece.

11

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Finally, the government asserts Tsontos Romania's separate "banking and bookkeeping" activities and filings with the Romanian authorities are not evidence that Tsontos Romania maintained a separate personality (gov't opp'n at 17). Appellant correctly notes this is the government's interpretation of these facts and not a factual dispute (app. reply at 22).

B. Tsontos Romania Performed the Contract Work

The government also contends appellant's summary judgment motion should be denied because Tsontos Greece and not Tsontos Romania performed the contracted work (gov't opp'n at 16-22). Contrary to the government's contention, the undisputed facts clearly indicate Tsontos Romania performed most of the work on the task orders. The Tsontos Romania organizational structure and staffing charts indicate many of the key employees that performed the task order work were in Romania (SOF ¶ 9). These key employees entered employment contracts with Tsontos Romania (SOF ¶ 10). Tsontos Romania also entered numerous contracts with subcontractors to perform the work under the task orders (SOF ¶ 13). Finally, Tsontos Romania performed most of the key administrative functions such as bookkeeping and banking transactions in Romania (SOF ¶ 11).

The government argues disputed material facts exist as to whether Tsontos Greece or Tsontos Romania performed the contract work (gov't opp'n at 16-22). The government first points out Tsontos Greece entered into the first subcontract with the designer of record on the MK Cargo Apron Task Order a month before it established Tsontos Romania (gov't opp'n at 9, 16; SOF ¶ 13). That subcontract, however, indicated the contract would transfer from the "Mother" company to the new branch when that branch was established (SOF ¶ 13). The government does not dispute Mr. Tsontos entered the rest of the subcontracts required to perform the work on the task orders on behalf of Tsontos Romania and not Tsontos Greece (*id.*).

The government next contends Tsontos Greece charge of a home office overhead rate on the task order billings indicates Tsontos Romania was not separately performing the contract (gov't opp'n at 16). The government is simply incorrect. A home office's allocation of overhead costs to a division or branch does not indicate that division or branch is not performing its contracts. Rather, the FAR required Tsontos Greece to allocate some portion of its home office costs to Tsontos Romania since the branch received some benefit from those costs. *See* FAR 31.201-4 ("A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship"). The functions Tsontos Greece apparently performed for Tsontos Romania appear to be those a home office typically performs for a division or branch (i.e., management support costs, travel support, home office accounting and human resources and training support (SOF ¶ 12). Moreover, the government's contention concerning Tsontos Greece's charge of a

12

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

home office overhead rate is not a disputed material fact but rather the government's interpretation of that fact.

Finally, the government argues the parties "had a common understanding that the awardee was performing the work under the contract and the awardee's Romanian branch acted as an extension of the awardee in Romania" (gov't opp'n at 17). In support of this contention, the government points to various statements from appellant's request for equitable adjustment (REA) (gov't opp'n at 17-18). Appellant does not dispute the language cited by the government but rather contends the government's characterization of that language is incorrect and points to other language in those documents that indicate the branch was operating under its own name and address (app. reply at 23). The government's reference to the language in the REA does not create a material factual dispute.

The government has not identified any genuine material factual disputes. Rather, the government raises various disagreements with appellant's interpretation of certain facts but does not dispute the underlying facts themselves. The government's differing interpretation of the facts does not create a material factual dispute. *Betance Enterprises*, *Inc.*, ASBCA Nos. 63076, 63077, 63078, 63079, 23-1 BCA ¶ 38,273 at 185,835 ("arguments regarding the proper conclusions or inferences to be drawn from these facts, or the proper context and interpretation of these facts, in no way establishes the existence of a genuine issue as to the facts themselves").

## C. USACE's Internal CPARS Guidance

Finally, appellant notes the government's action in issuing the CPARS to Tsontos Greece rather than Tsontos Romania contradicted the USACE's own internal CPARS guidelines (app. mot. at 29-30). The USACE's "Guidance for the Contractor Performance Assessment Reporting System (CPARS)" section on "Instruction for Completing Evaluations" indicates the name and address of the division or subsidiary of the contractor performing the contract or order should be listed (SOF ¶ 19). The guidance also indicates the report should identify the parent corporation (*id*.). Instead of following this guidance, the USACE listed "Michael M. Tsontos, S.A." as the contractor and left the entry for the division name on the CPARS blank (SOF ¶ 14).

## CONCLUSION

We conclude the undisputed facts show Tsontos Romania was the "entity, division or unit" that performed the task orders within the meaning of FAR 42.1502(a). Where there is no genuine dispute as to any material fact, appellant is entitled to judgment as a matter of law. *See Avant Assessment, LLC*, ASBCA No. 58867, 15-1 BCA ¶ 36,067 at 176,127. Here, we determine the government's issuance of the CPARS to Tsontos Greece rather than Tsontos Romania was not in

13

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

accordance with the FAR 42.1502(a) requirement to issue the CPARS to the "entity, division or unit" that performed the contract.[6]

For the reasons set forth above, appellant's motion for summary judgment is granted. We remand the CPARS back to the USACE for action consistent with this decision.

Dated: October 30, 2024

ARTHUR M. TAYLOR
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[6] To be clear, we are not deciding whether the attribution of Tsontos Romania's performance on the task orders should be considered in evaluating any future Tsontos Greece bid proposals.

14

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63595, Appeal of Michael M. Tsontos, S.A. Chania Sucursala Bucuresti, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals